Charity L. **PAYNE**, Appellant–Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 71A04–0506–CR–362.

Court of Appeals of Indiana.

Aug. 31, 2006.

James H. Voyles, Jennifer M. Lukemeyer, Voyles Zahn Paul Hogan & Merriman, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Charity L. Payne (Payne), appeals her conviction for Counts II–IV, murder, a felony, Ind.Code §§ 35–42–1–1(2); 35–41–2–4; and 35–43–2–1.

We reverse and remand for a new trial.

### ISSUES

Payne raises three issues on appeal, which we restate as:

(1) Whether the trial court properly admitted into evidence Payne's full statement to the police where the majority of the statement was obtained prior to the advisement of her *Miranda* rights and the remaining portion of the statement was obtained without a voluntary waiver of her *Miranda* right;

(2) Whether the trial court properly admitted into evidence a letter from Payne to her former boyfriend; and

(3) Whether the trial court properly admitted into evidence a videotaped statement given by a participant in the crime after he refused to testify at Payne's trial.

### FACTS AND PROCEDURAL HISTORY

During the summer of 1999, after meeting in summer school, Payne dated John Sears (Sears). While dating, Payne often visited Sears' parents home, located on Oak Road, in St. Joseph County, Indiana. She became familiar with the general layout of the residence and learned that a second floor window could be used for entry and exit without triggering the home's security system.

On Tuesday, September 12, 2000, Payne and her best friend, Emily Houser (Houser), went to a local mall to meet a friend. As they were leaving the mall, they encountered four young men, Robert (aka "Punkin") Washington (Washington), Kerel (aka "Cuz") Seabrooks (Seabrooks), George (aka "G") Tinsley (Tinsley), and Sovino Lopez (Lopez). Sometime after the four men initiated a conversation, Payne and Seabrooks exchanged phone numbers.

The next day, Wednesday, September 13, 2000, Payne drove Houser to work so she could borrow Houser's vehicle to attend a work orientation with Martin's Supermarkets. However, on her way to the orientation, Payne found herself in the area of 1713 Walnut Street in South Bend. This residence served as a hang-out for the four men she had met at the mall and their friends. As Payne drove by the house more than once slowly without stopping, she was recognized by Seabrooks who yelled for her to stop. Finally, Payne did stop when Philip Stroud (Stroud) stepped in front of the car. The two spoke for a moment, and then Stroud left with Payne but they returned to the Walnut Street address ten minutes later. Thereafter, she left again with Stroud and Tyrome Wade (Wade), to return one or more hours later. Upon their return from the second trip, Payne entered the Walnut Street residence and talked with "everybody that was in the front room with her." (Transcript p. 547). After she left the house, Stroud said that the "white bitch got a lick," a lick being slang for a robbery prospect. (Tr. p. 553). Payne never saw the men again.

On Thursday, September 14, 2000, three construction workers from Arndt Construction were installing a loft in the barn at the Sears' residence. They were the only ones on the property when Stroud, Seabrooks, Ronald Carter (Carter), and Wade arrived at the home. Despite no one appearing to be at the residence, the four men decided to leave. As they were leaving, one of the workers came out of the barn, and asked them what they wanted. Stroud explained they had come to inquire about a car for sale he had read about in an advertisement. The four-some was about to pull away when Stroud put the car in reverse and informed the others that they were at risk of being identified. After exiting the car, the four men went into the barn where they encountered the workmen. The three construction workers were first duct taped and then shot in the head by Stroud. Prior to the shootings, Carter removed money from one of the workers' wallets. After the killings, Seabrooks retrieved a ladder and propped it up to an upstairs window. Entering the residence through the window, Wade and Seabrooks returned with a filled suitcase.

Calvin Shumaker (Shumaker), a construction worker who performed carpentry and construction contract work on an as-needed basis, missed the Sears' assignment because of a doctor's appointment. After visiting the doctor, he went to the Sears' residence to "check on the guys." (Tr. p. 382). Entering the barn, he found the bodies of Corby Myers, Lynn Ganger, and his brother Wayne Shumaker. Shumaker called Arndt Construction and told them to call 911.

That same evening, Payne was at work at Richmond Masters, and when she called her father about a ride home, he told her to be careful because police had discovered a triple homicide. Payne became hysterical, and indicated to Matthew Illes (Illes), her coworker, that she believed this triple homicide was her fault. She told Illes about meeting the four men and telling them about the Sears' residence. She confided that these men would kill people if

they had to. Later that same evening, Payne's supervisor, Tearra Ellsworth (Ellsworth) confronted Payne about her job performance. Payne instantly revealed to her that she believed herself to be an "accomplice to a triple homicide." (Tr. p. 667). On the morning of September 15, 2000, Ellsworth learned that there was, in fact, a triple homicide, and she immediately called the St. Joseph County Police to report her conversation with Payne.

Lieutenant James Clark of the Special Crimes Unit at the South Bend Police Department (Lieutenant Clark) received Ellsworth's information. At around 10:00 a.m. that morning, after arriving at Payne's home, Lieutenant Clark and Sergeant Kevin Whippo (Sergeant Whippo) (collectively, the Officers) requested Payne to accompany them to the police station to discuss the Oak Road incident. Payne agreed to come down to the Special Crimes office, but asked and received permission to change clothes first.

On their way to the police station, Whippo mentioned the Sears' residence and Payne responded that "she knew where the house was that these guys might live at." (Tr. p. 680). Although she couldn't give the Officers the name of the street, Payne directed them to the Walnut Street residence. The Officers requested another unit to conduct surveillance of the house. The execution of a search warrant for the home later that day discovered items stolen from the Sears' residence.

The Officers began interviewing Payne at around 11:00 a.m. At that time, they did not advise her of her *Miranda* rights. Throughout the interview, the Officers would leave Payne in the interrogation room for periods of time and return to ask her more questions, confronting her mainly with information gathered from other persons they were interviewing. At ap-

proximately 6:15 p.m. that evening, seven hours after the interview started, the Officers finally advised Payne of her *Miranda* rights. Upon *Mirandizing* her, the Officers confronted Payne more strenuously and with additional information collected from other individuals. Payne reiterated essentially the same facts as before receiving the *Miranda* advisement, but added the fact that she had driven a couple of the men to the Sears' home to show them the location. The entire interrogation lasted approximately eleven hours.

On September 18, 2000, the State filed an Information charging Payne with Count I, burglary, a Class A felony, I.C. §§ 35–43–2–1; 35–41–2–4; and 35–43–4–2. On September 29, 2000, the State filed an Amended Information, adding Counts II–IV, murder, a felony, I.C. §§ 35–42–1–1(2): 35–41–2–4: and 35–43–2–1. On September 17, 2001, prior to trial, Payne filed a Motion to Suppress asserting that the Officers had obtained her statement in violation of her *Miranda* rights. On October 30, 2001, after a hearing on the motion, the trial court ruled the entire statement to be admissible. Payne also filed a Motion in Limine prohibiting the introduction of a letter written by her to Sears in which she suggests a plan to rob a business where she then worked. On November 5, 2001, the trial court deemed the letter admissible and relevant.

On November 13 through November 20, 2001, a jury trial was held. At the close of the evidence, the jury returned a guilty verdict on all counts. On December 19, 2002, during the sentencing hearing, the trial court sentenced Payne to fifty-five years each on the three separate felony murder counts, merged the burglary charge with the felony murder counts, and ordered the sentences to be served consecutively.

Payne now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION
### I. *Payne's Miranda Rights*

Payne first contends that the trial court abused its discretion by admitting into evidence her entire statement to the Officers. Specifically, Payne asserts that only after she was interrogated for seven hours, did the Officers advise her of her *Miranda* rights and immediately thereafter, continued to take her statement. She now maintains that this two-part interrogation method circumvented *Miranda's* protections and accordingly, the entire statement should have been held inadmissible at trial.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Timberlake v. State,* 690 N.E.2d 243, 255 (Ind.1997), *reh'g denied, cert. denied.* An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Joyner v. State,* 678 N.E.2d 386, 390 (Ind.1997), *reh'g denied.*

### A. *Pre–Miranda Interrogation*

We have held that when an accused is subjected to custodial interrogation, the State may not use statements stemming from the interrogation unless it demonstrates the use of procedural safeguards effective to secure the accused's privilege against self-incrimination. *Davies v. State,* 730 N.E.2d 726, 733 (Ind.Ct.App.2000)(citing *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), *reh'g denied, trans. denied, cert. denied.* The *Miranda* warnings apply only to custodial interrogation because they are meant to overcome the inherently coercive and police dominated atmosphere of custodial interrogation. *Id.* To be in custody for purposes of *Miranda,*

the defendant need not be placed under formal arrest. *King v. State,* 844 N.E.2d 92, 96 (Ind.Ct.App.2005). Rather, the custody determination turns upon whether the individual's freedom has been deprived in a significant way or if a reasonable person in his position would believe he is not free to leave. *Id.* As such, the determination involves an examination of all the objective circumstances surrounding the interrogation. *Id.*

Further, an officer's knowledge and beliefs are only relevant to the question of custody if conveyed through either words or actions to the individual being questioned. *Id.* Similarly, a police officer's unarticulated plan has no bearing on the question of custody. *Id.* The test is how a reasonable person in the suspect's shoes would understand the situation. *Id.* When in custody, *Miranda* requires that the accused be informed of the right to the presence and advice of counsel during custodial interrogation by the police, and of the right to remain silent and that any statement he makes may be used as evidence against him. *See Wright v. State,* 766 N.E.2d 1223, 1229 (Ind.Ct.App.2002).

Here, the record shows that the Officers, acting on the information received from Ellsworth, Payne's supervisor, visited Payne's residence. In fact, Ellsworth claimed that Payne referred to herself as an "accomplice." (Tr. p. 667). The Officers testified that upon arriving at Payne's residence, they asked her to accompany them to the Special Crimes Division to discuss the triple homicide. They offered Payne a ride, which she accepted. The record discloses that on their way to the police station, Sergeant Whippo mentioned the incident at the Sears' residence and Payne responded that "she knew where the house was that these guys might live at." (Tr. p. 680). Although she couldn't

give the Officers the name of the street, Payne directed them to the Walnut Street residence.

At the police station, the Officers placed Payne in an interview room and commenced interviewing her at around 11:00 a.m. Although Sergeant Whippo testified that Payne was free to leave, the recording of the initial seven-hour phase of the interview shows that when Payne asked if she could go outside to smoke, the Officers responded that she could smoke inside the room and brought her an ashtray. At no time did the Officers indicate to Payne that she was free to leave. When asked to go to the bathroom, they escorted her out of the room. Even though she was permitted to speak to her father, he was brought to her and the conversation was likewise recorded. The recording shows that while she was not interviewed during the entire initial seven hours, the Officers sporadically left and re-entered the room without offering Payne a choice as to whether she wanted to stay in the interview room. Specifically, at one point, when one of the Officers leaves the interrogation room, he asks Payne if there is anything he can get her and adds "other than out of here." (Exhibit 39). After leaving the room, the Officers would interview other suspects in an attempt to verify parts of Payne's answers. While interviewing Payne, they would question her in a tag-team fashion, with the questions becoming increasingly confrontational trying to pin Payne down on answers and, at the same time, questioning her veracity and relaying their doubt about her version of events. Only after Payne had essentially divulged all information over the course of seven hours, did the Officers advise Payne of her *Miranda* rights only to have her repeat the entire story over the course of another four hours.

Despite Sergeant Whippo's testimony to the contrary, it is clear that Payne was subjected to restraints on her freedom while being questioned during the initial seven-hour interview at the police station. The record clearly supports that this unwarned interrogation at the station house was systematic, exhaustive and, as we noticed from our review of the taped interview, managed with psychological skill. The Officers elicited incriminating information from Payne over a seven-hour period. Intermittently leaving the room to interrogate other suspects, they returned only to confront Payne with problems in her version of the events. Regardless of this buildup of incriminating evidence, the Officers waited to advise Payne of her *Miranda* warnings until she essentially had divulged her entire involvement.

As Payne was eighteen years old at the time of this interrogation and had never been in trouble with the law before, the nature of the confrontational questions and the Officers' refusal to let her leave the interrogation room would lead a reasonable person in her situation to believe she is no longer free to leave. Accordingly, for purposes of *Miranda*, Payne was in custody at the time the Officers questioned her. Because Payne was subjected to a custodial interrogation without the benefit of the *Miranda* warning, we find the pre-*Miranda* statements to be inadmissible. As such, we hold that the trial court abused its discretion by admitting Payne's pre-*Miranda* statements.

B. *Post–Miranda Interrogation*

In *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) our Supreme Court specifically disapproved of an interrogation technique in which police officers purposefully withhold *Miranda* warnings until a confession is obtained, and thereafter, give *Miranda* warnings and obtain a waiver before elicit-

ing a second similar confession. *Id.* at 2610–11.

In *Seibert,* police officers arrested a suspect in an arson/murder investigation and refrained from giving her *Miranda* warnings. *Id.* at 2606. After questioning the suspect for thirty to forty minutes, she finally admitted that the death caused by the arson was not an accident. *Id.* The suspect was then given a twenty-minute break, after which the police officer turned on a tape recorder and gave her a *Miranda* warning. *Id.* The officer then resumed questioning her, confronting her with her pre-*Miranda* statement. *Id.*

In determining that this second statement was inadmissible, the Supreme Court observed:

Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when Miranda warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."

*Id.* at 2601

Following *Seibert,* in *Drummond v. State,* 831 N.E.2d 781, 783–84 (Ind.Ct.App.

2005) and *King v. State,* 844 N.E.2d 92, 98 (Ind.Ct.App.2005), we determined that a defendant's statement was inadmissible when a defendant only received *Miranda* warnings after he was subjected to a custodial interrogation and had made some incriminating statements.

Similarly, here, the initial seven-hour interrogation conducted without giving Payne the benefit of *Miranda* warnings, was all-encompassing and, as we noticed from our review of the taped interview, managed for the purpose of eliciting incriminating information from her. Despite the buildup of incriminating evidence, the Officers waited to advise Payne of her *Miranda* warnings until she essentially had divulged her entire involvement. Prior to her *Miranda* warnings, Payne had admitted that she had provided a description of the Sears' alarm system and the family's schedule to the four men, that Stroud had told her that he would kill anyone at the residence when committing the burglary, and that she had spent more than just a few moments with some of the four individuals. Although she had omitted one detail, *i.e.,* that she had driven two of the four men to the Sears' residence to show them its location, we agree with Appellant that "this particular detail was not such that it [suddenly] would have moved her from witness status to suspect status." (Appellants Br. p. 17). Accordingly, when the Officers were finished there was little of incriminating potential left unsaid.

Then, upon being advised of her *Miranda* rights and having signed a voluntary waiver, the Officers confronted her with the information that she had driven two of the four to the Sears' home to show them where it was located. Visibly upset, she reiterated the entire story including this additional detail. Furthermore, the impression that the renewed questioning

after being advised of her *Miranda* rights was a mere continuation of the earlier questions and responses was fostered by the references back to the confession already given during the unwarned phase of the interview.

Based on the evidence before us, we find that this two-part interrogation appears to be exactly of the character that the *Seibert*, *Drummond*, and *King* courts sought to avoid. Therefore, we find that the trial court abused its discretion by admitting Payne's post-*Miranda* statement.

### C. Harmless Error

 The State now attempts to avoid the application of *Seibert* by relying on the harmless error doctrine. Statements obtained in violation of *Miranda* and erroneously admitted are subject to the harmless error analysis. *Davies v. State*, 730 N.E.2d 726, 735 (Ind.Ct.App. 2000), *reh'g denied, trans. denied, cert. denied.* A federal constitutional error is reviewed *de novo* and must be "harmless beyond a reasonable doubt." *Id.* (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). A reviewing court must be satisfied that the State has "met its burden of demonstrating that the admission of the confession ... did not contribute to [the] conviction," that is, that the error was unimportant in relation to everything else the jury considered on the issue in question. *Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

We conclude that the admission of Payne's lengthy confession was not harmless under this standard. A confession is like no other evidence. As the Supreme Court stated in *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991), *reh'g denied:*

the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.

By admitting Payne's eleven hour confession into evidence and showing the jury a redacted version of approximately three hours, the jury was exposed to the powerful evidence of an eighteen-year old girl, interrogated in a tag-team fashion by experienced Officers who became increasingly aggressive and assured her "we're your best bet now" and, who is, at a certain point, consoled by her parents. (Exhibit 39). In between the interrogations, the videotape shows her visibly upset, trying to maintain her composure and, near the end, overcome with fatigue. (Exhibit 39).

Not only was this videotaped statement shown to the jury, the State's closing argument was littered with references to Payne's interrogation. During closing, the State lifted statements and quotations directly from the taped statement: *e.g.*, "You should have gone for the lottery" and "Well, then I decided to go to [a] friend's [ ] house on West Indiana Avenue." (Exhibit 39, Tr. p. 776, 778). Additionally, the State commented on Payne's demeanor and attitude during her interrogation: *e.g.*, "She makes another chilling statement, too, . . ." (Tr. p. 795).

The State now attempts to persuade us that most of the information revealed by Payne during her interrogation is cumulative to other evidence presented at trial. We disagree. Although some parts of Payne's statement can be considered cumulative to other evidence presented, many details directly relating to Payne's

involvement were not. Only Payne's statement informs the jury about the initial conversation with Stroud wherein Payne hands him most of the details to commit the burglary of the Sears' residence. Specifically, Payne's videotaped statement is the only evidence presented at trial as to how and where she started talking to Stroud about Sears. It reveals how she "blurt[ed] out" "Well, they make $10 million[,] [t]he maid's there" and how Stroud continues to press her for more details. (Tr. p. 793).

Even though the State conjectures in its closing statement that the Officers found out this information by talking "to the other guys," the "other guys" did not testify to these details at trial. (*e.g.* Tr. p. 794). The record shows that the only evidence deduced at trial from other witnesses merely established that Payne and Stroud went for a ride and that, after Payne had left the Walnut street residence, Stroud said that the "white bitch got a lick." (Tr. p. 553). Even though we acknowledge that a closing argument cannot be considered as evidence, here, not only did the State reference what the jury had seen in the video, the State also repeated part of the videotaped statement in their rebuttal argument, again reinforcing Payne's direct statements.

Based on all this evidence, we conclude that the error in admitting the taped confession obtained in violation of Payne's *Miranda* rights was not harmless. It is undeniable that Payne's own words and demeanor, bolstered by the State's usage of them in its closing argument, had such a profound impact on the jury that we may justifiably doubt the jurors' ability to put it out of their mind even if told to do so. *See Fulminante*, 499 U.S. at 296, 111 S.Ct. 1246. Accordingly, we are not satis-

fied that the State has "met its burden of demonstrating that the admission of the confession ... did not contribute to [the] conviction." *Davies*, 730 N.E.2d at 735. Therefore, we reverse the trial court's decision and remand for a new trial.[1]

## II. *Payne's Letter to Sears*

Next, Payne contends that the trial court erred when it admitted a portion of a letter written to Sears when they were dating. Specifically, Payne asserts that the trial court admitted the letter to show that she was not acting under a mistake of fact or accident, even though she did not affirmatively present that she was operating under a mistake of fact or by accident. Therefore, Payne maintains that the letter was erroneously admitted pursuant to Indiana Rule of Evidence 404(b).

 We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind.Ct.App.2004). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* However, if a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." *Id.* Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. *Id.*

Exhibit 24, a portion of Payne's letter to Sears, was admitted at trial over Payne's objection. In the letter, which appears to be a stream of consciousness and a flow of

---

1. Even though this issue is dispositive of the case before us, we will nevertheless address Appellant's other two arguments as they also relate to the admissibility of evidence at trial.

rambling thoughts, Payne describes how easy a robbery or burglary target her then employer would be. The letter specifically describes why the business would be a profitable and easy target. Beyond the words in the letter, the record contains no evidence of any overt acts toward the robbery or burglary. The record is devoid of any limiting jury instructions as to the evidentiary value of the letter.

The State acknowledges that while propensity evidence is generally not admissible, in this case, the letter is admissible because (1) it provides evidence of a pertinent trait of Payne's character, as provided for in Ind. Evidence Rule 404(a) and (2) it goes towards Payne's intent under Evid. R. 404(b)

### A. *Indiana Rule of Evidence 404(a)*

Indiana Rule of Evidence 404(a) provides that

> Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) ... [e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same.

█ In support of its argument based on Evid. R. 404(a), the State relies on Dr. Seldin's "testimony" that Payne introduced evidence to establish that she was naïve and very susceptible to being influenced. While we agree that Payne attempted to introduce evidence of these character traits through Dr. Seldin's testimony at trial, our review discloses that the trial court had excluded this testimony from trial during the motions hearing on November 5, 2001. Nevertheless, the State now tries to persuade us that Dr. Seldin testified at trial and actually reiterates to us the content of her testimony. Regardless, we would encourage the State to actually read the trial transcript as Dr. Seldin was not permitted to testify to the jury.

The record clearly shows that during the course of the trial, she was permitted to give a limited offer of proof outside the presence of the jury. The trial court concluded this offer of proof by ruling that "I renew my order that the witness tendered by the defense will not be permitted to testify." (Tr. p. 761).

As our review of the record reveals that Dr. Seldin's testimony was never heard by the jury, the jurors were never exposed to any evidence regarding Payne's naivety and susceptibility. Also, we find that a mere remark in Payne's opening statement that "this young lady [is] gullible, easily misled, [and] very trusting of all individuals," without more, is insufficient for the State to introduce character evidence to the contrary as there is no evidence yet "to rebut." *See* Evid. R. 404(a). Accordingly, we do not find the letter to be admissible pursuant to Evid. R. 404(a).

### B. *Indiana Rule of Evidence 404(b)*

█ Indiana Rule of Evidence 404(b) provides that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident ...

This rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities, the so-called 'forbidden inference'." *Id.* at 406 (citing *Hicks v. State,* 690 N.E.2d 215, 218–19 (Ind.1997)). Thus, in assessing the admissibility of evidence under Indiana Evidence Rule 404(b), the trial court must: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and

(2) balance the probative value of the evidence against its prejudicial effect pursuant to Evid. R. 403. *Id.*

The State maintains that Payne's letter to Sears was properly admitted at trial because it establishes evidence of her intent. We have previously held that evidence of prior bad acts is relevant to negate a claim of contrary intent. In *Wickizer v. State,* 626 N.E.2d 795 (Ind. 1993), our supreme court provided guidance on the application of Evid. R. 404(b) in future cases, examining specifically the intent exception of the rule. *Wickizer* held that the intent exception was available only when a defendant went beyond merely denying the charged culpability and affirmatively presented a claim of particular contrary intent. *Id.* at 799.

■ In this respect, intent is unlike the other listed exceptions in Evid. R. 404(b). Intent is often an element of the crime and is likely to be found relevant. *See Hicks,* 690 N.E.2d at 224 fn. 12. A prior intent to commit a bad act, however, although of some relevance, "introduces the substantial risk of conviction based predominately on bad character," because, since the defendant meant to cause harm before, he must therefore have meant to cause harm in this case. *Wickizer,* 626 N.E.2d at 797. Because of this danger, our supreme court in *Wickizer* narrowly construed the intent element. *Id.* at 799.

Consequently, the intent exception in Evid. R. 404(b) will only be available when a defendant alleges a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief. *Id.* The State may then respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. *Id.* This narrow construction was somewhat extended in

*Whitehair v. State,* 654 N.E.2d 296 (Ind. Ct.App.1995). In *Whitehair,* we found that the effect of a defendant's pre-trial statement to police, combined with his counsel's opening remarks, placed defendant's intent at issue. *Id.* at 302.

First, the State relies on Dr. Seldin's "testimony" to support its claim that Payne affirmatively presented a claim of particular contrary intent. However, as we pointed out above, Dr. Seldin's proposed testimony was excluded during a motions hearing, approximately a week before the trial. Accordingly, the State cannot now rely on Dr. Seldin's testimony as basis for its argument that Payne presented evidence showing her inability to form the requisite intent.

Next, the State alludes to Payne's opening statement as saying that she intended to challenge the State's proof on the intent element. Our review of Payne's opening statement reveals the following argument:

[DEFENSE COUNSEL]: The State, over the next few days, will parade numerous witnesses to the stand in an effort to have those witnesses depict the crimes themselves, the crime scenes, the victims, the perpetrators, and [Payne]. The State will attempt to portray [Payne] as a vindictive, mean-spirited woman. They will attempt to portray [Payne], the accused, as voluntarily, knowingly, and/or intentionally planning the burglary of the Oak Road residence with the perpetrators of the actual crimes, but nothing could be further from the truth. The evidence will show this young lady to be gullible, easily misled, very trusting of all individuals.

(Tr. pp. 376–77).

Unlike the State, we conclude that Payne's opening statement is merely a summation of the State's evidence in light of the State's burden of proof. Mindful of

the narrow intent construction promulgated by our supreme court, we find that the letter cannot be admitted under the intent exception of Evid. R. 404(b) since she did not affirmatively present a particularized claim of contrary intent. *See Wickizer*, 626 N.E.2d at 799.

### 2. *Mistake of Fact or Accident*

██ Even though the State does not raise the argument in its appellate brief, during the motions hearing discussing the admissibility of the letter, the State also argued that the letter should be admitted under the mistake of fact or accident exception of Evid. R. 404(b). At trial, after Payne objected to the introduction of the letter, based on the "same objection as previously," the trial court denied Payne's objection before even giving the State a chance to respond to the objection. (Tr. p. 430). Thus, for completeness' sake, we will address the admissibility of the letter under the mistake of fact or accident exception.

Indiana law defines a mistake of fact defense as follows: "that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for commission of the offense." *McCloud v. State*, 697 N.E.2d 96, 99 (Ind. Ct.App.1998); I.C. § 35–41–3–7. We have held that the mistake of fact defense is available where the defendant, acting under a reasonable and honest mistake concerning a fact or facts commits an act which, if the facts were as the defendant believed them to be, would not be criminal. *Id.* (citing *Sureeporn Roll v. State*, 473 N.E.2d 161, 166 (Ind.Ct.App.1985)). In other words, the defense involves the mental state of the defendant. *Id.* A mistake

of fact defense requires the defendant to convince the court that his mistake was (1) honest and reasonable, and (2) about a matter of fact, and (3) the mistake negated the culpability required to commit the crime. *Id.* (quoting *Potter v. State*, 684 N.E.2d 1127, 1135 (Ind.1997)).

Here, we agree with Payne that her defense did not hinge on the type of mistake of fact contemplated by our rules of evidence. In fact, after reviewing the record, it appears her defense revolved more around the argument that she did not take the four men seriously when she was providing them information about the Sears' residence. Stressing the element that her role was minimal and that she should not be punished as if she was actually there, she seemed to rely on the argument that her involvement just was not enough to warrant a conviction for these offenses. Accordingly, we conclude that the admissibility of the letter fails under the mistake of fact or accident exception of Evid. R. 404(b).[2]

### C. *Harmless Error*

██ As we concluded that the letter is inadmissible character evidence pursuant to Evid. R. 404, the State, nevertheless, now asserts that even though the letter was improperly admitted, such error is harmless. Essentially, the State raises the mistaken belief that the letter is cumulative of other evidence introduced at trial. In effect, the State asserts that it presented "substantial independent evidence of [Payne's] guilt." (Appellee's Br. p. 21). However, in order for the cumulative evidence theory to survive our review, the State was required to prove that the content of this particular letter, which was erroneously admitted, was cumulative of

---

2. Because we find that the letter was inadmissible under the first prong of Evid. R. 404(b), we do not need to reach the second prong of admissibility of the 404(b) test, *i.e.,* whether

the letter's probative value is substantially outweighed by the danger of unfair prejudice pursuant to Evid. R. 403.

other evidence appropriately admitted. *Iqbal*, 805 N.E.2d at 406.

In the instant case, the record shows that no other evidence was introduced establishing the fact that Payne had previously provided information describing how easy a robbery or burglary target her then employer would be. More egregious however is the fact that the State, under the guise of contradicting an absence of mistake or accident defense, in its closing argument clearly uses the content of this letter to induce the jury to make the forbidden inference, *i.e.*, action in conformity thereof. After providing the jury with a side-by-side comparison of the letter's content with Payne's actions in this case, the State asks the jury to conclude that Payne wanted to be included in the conspiracy. We agree with Appellant that the State's closing argument amounted to "she meant it before so she means it again," thereby invading the province of forbidden propensity evidence. *See Wickizer*, 626 N.E.2d at 797. Specifically, the State argued:

> There was no [Stroud] when she wrote this letter to [Sears] when they were lovers. Compare this letter. "Hey, guess what, man? You know that safe I was telling you about?" . . . "That I was telling you about."
>
> Hey [Stroud], you know that house at the Sears' residence where they make $10 million?
>
> [Letter:] "Well, get this. At night, every night, like tonight, man, they fuckin' have cleaners come in to sweep the carpets, right, and like two guys and then the gay guy, Richard, is usually there, but the owner, Eric, ain't. Well they fuckin' leave the side door open."
>
> Hey [Stroud], you know how to get into the Walnut Street address [sic]? You climb up to the second floor because then you get around the security.

You see the familiarity and similarity between these things? It's usually there. The owner ain't.
[Letter:] "Well, they fuckin' leave the side door open for employees to go in and out of. And on any night you could just fuckin' mask up and fuckin' go in with a gun and scare the carpet cleaners off, so it's just you and little gay ass Richey and you could fuckin' make his ass take you to the safe and give you all that money and the register money because his stupid ass would have the register key on his key chain and then fuckin' leave before he could do anything like call the cops or some bullshit . . . ."
Man, [Stroud], you can go down to the Sears' house. They make $10 million a year. How to get into the place? What's there? . . .

(Tr. pp. 817–19).

Accordingly, we find the importance placed by the State on the letter, especially in closing argument, to be significant in our assessment of reversible error. Because of the State's side-by-side comparison, we conclude that the erroneously admitted letter had a substantial likelihood of contributing to the jury's verdict. *See McCloud*, 697 N.E.2d at 100. Therefore, we reverse the trial court's ruling with respect to the admission of Payne's letter to Sears.

### III. *Testimonial Statement given by Unavailable Witness*

■ Lastly, Payne contends that the trial court erred by admitting into evidence Carter's videotaped walk-through of the crime scene after he was deemed unavailable to testify by his own refusal. At trial, Carter, a State's witness, refused to testify despite being offered use immunity and being ordered to testify by the trial court. In lieu of Carter's live testimony, the State then offered Exhibit 33 into evidence which was a videotaped walk-

through at the Sears' residence by Carter and the Officers. Payne objected to the introduction of the exhibit on the basis that it inculpated her. Over Payne's objection, the trial court admitted the videotaped statement into evidence.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Iqbal v. State,* 805 N.E.2d 401, 406 (Ind.Ct.App.2004). An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.*

As neither party appears to dispute the unavailability of Carter as a witness at trial, we turn to Indiana Rule of Evidence 804(b) which establishes an exception to the traditional hearsay rule by admitting certain out-of-court statements when the declarant of these statements is unavailable to testify at trial. This exception provides, in pertinent part,

> (3) Statements against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception [to the hearsay rules].*

Ind.Evidence Rule 804(b)(3) (emphasis added).

Here, we find that Carter's videotaped statement clearly implicated both himself and Payne, and thus in accordance with Evid.R.804(b)(3) falls squarely within the types of statements our hearsay rules intended to exclude. Our review of the record discloses that the State never disputed the fact that Payne did not accompany Stroud and the others to the Sears' residence, rather, the jury instructions clarify that the State painted Payne as inducing or assisting the four men in committing the burglary and felony murders.

In this regard, Carter elaborates in his videotaped statement how the four men arrived at the Sears' residence and were initially confronted by one of the workmen. After Stroud provided an excuse as to their presence at the residence, Carter explains how and why the plan unfolds to kill the three construction workers. He tells the Officers that Stroud informed the other men that they needed to "go in and lay them down" because the workmen might have taken down their license plate number. (Exhibit 33). The videotape shows Carter entering the barn and describing how the workmen were tied up with duct tape and ordered to lay down in a line. After Carter describes going through their wallets, Carter gives a vivid description of the murders. He not only acts out the murders by motioning how Stroud placed the gun to the workman's head, but also imitates the gunshot. Upon having the Officers walk through the triple homicide in the barn, Carter continues to describe the burglary and tells the Officers that entry was made through a second floor window.

However, evidence that the burglary was committed by entering through a second story window was already before the jury through the testimony of Shumaker who testified to seeing a ladder near the side of the house and by the testimony of a responding officer who noticed that the second story window's screen was knocked out. Furthermore, both Illes and Ellsworth testified at trial that Payne had informed them about the window at the

Sears' residence which could be used as a point of entry. Although Carter's testimonial statement is the only direct evidence as to what exactly happened that day at the Sears' residence, he never acknowledged that Payne provided them this particular piece of information. In fact, her name never even comes up during the entire walk-through of the crime scene. Accordingly, we can discern no other valid legal reason to admit the videotape than to prove that the burglary was committed in accordance with Payne's instructions, *i.e.*, entering through the second floor window of the Sears' residence. Thus, as Carter's videotaped statement clearly implicated Payne, we find that the trial court abused its discretion by failing to exclude it pursuant to Evid. R. 804(b)(3).

■ However, when the trial court has erroneously admitted evidence, we "must disregard any error or defect which does not affect the substantial rights of the parties." *Bass v. State*, 797 N.E.2d 303, 307 (Ind.Ct.App.2003). The improper admission of evidence is harmless error when the conviction is supported by such substantial evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction. *Id.* Here, we are not satisfied. As possible evidence of Payne's involvement was already properly before the jury, the only purpose the videotaped statement served was exposing the jurors to a vivid description of a horrific and senseless crime and have it infer guilt back upon Payne. Viewing Carter's testimonial statement in this light, we conclude that his statement substantially contributed to Payne's conviction. Thus, we hold that the admission of his videotaped statement is not harmless error.

### CONCLUSION

Based on the foregoing, we find that (1) the trial court erred by admitting into evidence Payne's statement which was obtained in violation of her *Miranda* rights; (2) the trial court erred by admitting into evidence Payne's letter to her former boyfriend; and (3) the trial court erred by admitting into evidence a testimonial statement given by an unavailable co-defendant.

Reversed and remanded for a new trial.

SHARPNACK, J., and BARNES, J., concur.