920 N.E.2d 783 (2010)
In the Matter of S.W., A Child in Need of Services, S.W., Appellant-Respondent,
v.
Indiana Department of Child Services, Appellee-Petitioner.
No. 52A02-0910-JV-1005.
Court of Appeals of Indiana.
February 2, 2010.
*784 Kimberly A. Jackson, Indianapolis, IN, Attorney for Appellant.
Peter Diedrichs, Indiana Department of Child Services, Peru, IN, Attorney for Appellee.

OPINION
RILEY, Judge.

STATEMENT OF THE CASE
*785 Appellant-Respondent, S.W.,[1] appeals the trial court's determination that she is a Child In Need of Services (CHINS).
We affirm.

ISSUES
S.W. raises two issues which we restate as follows:
(1) Whether the trial court erred by admitting evidence of S.W.'s drug use; and
(2) Whether the Indiana Department of Child Services Division of Miami County (DCS) presented sufficient evidence to prove by a preponderance of the evidence that S.W. is a CHINS.

FACTS AND PROCEDURAL HISTORY
On June 24, 2009, S.W. was seventeen years old. That evening, the Peru Police Department received a call from the mother of A.C., a juvenile female, reporting that A.C. had runaway. A.C.'s mother stated that A.C. had been last seen with her friend S.W. parked in a vehicle in front of S.W.'s home with an adult woman. Officer Gregory Martin (Officer Martin) of the Peru Police Department went to the home of S.W. about p.m. and asked S.W.'s father if he knew the whereabouts of S.W. He did not because he had been asleep, and told Officer Martin that he did not want to know. S.W.'s mother told Officer Martin that S.W. was probably out with a friend and was expected home by 11 p.m.
About the same time, Deputy Ronald Dausch (Deputy Dausch) of the Miami County Sheriff's Department went to check on a possible location for A.C. En route, he noticed S.W. and A.C. walking down the road in a rural area of the county about twelve miles from S.W.'s home, and he stopped. The girls stated that they had been at a boy's house and A.C.'s uncle was on his way to pick them up. Deputy Dausch took A.C. into protective custody, and asked S.W. for a phone number for her parents. Deputy Dausch called the phone number, her mother answered and he began explaining the situation. While doing so, S.W.'s father cut in and told Deputy Dausch they were not coming to pick up S.W. and hung up. Deputy Dausch took the girls to the Peru Police Department's station. A.C. was released from custody.
Angela Bokan (Bokan), a Family Case Manager with the DCS, met with S.W. at the police station and attempted to call S.W.'s parents several times after receiving the report from Deputy Dausch. She was unable to contact anyone. Bokan spoke with S.W. regarding her parents not answering the phone and S.W. told Bokan that her father was reacting in his typical manner. Bokan decided that it was best if S.W. was temporarily placed in shelter care and sought out and received an oral emergency detention order from the judicial officer on call. S.W. told Bokan that drug use and domestic violence had occurred in her home following DCS's involvement with her family approximately one year prior.
The next day, a hearing was held and the trial court ordered continued detention, appointed a special advocate for S.W., and authorized the filing of a CHINS petition by the DCS. On June 30, 2009, the DCS filed the CHINS petition. On July 8, 2009, the trial court held an initial hearing, found that continued detention was appropriate, but approved visitation of S.W. for her mother and father, and set a fact finding hearing on DCS's continued intervention for July 29, 2009.
*786 At the fact finding hearing, Deputy Dausch acknowledged that when he took S.W. into custody S.W. was not out beyond curfew and had committed no crime or infraction of any sort. At one point Deputy Dausch testified that he took S.W. to the police station because "anything could happen to her" in the rural location where he had found A.C. and S.W. walking. (Transcript p. 53). But later Deputy Dausch testified that he had been given express instructions to bring S.W. to the police station by "Child Protective Services." (Tr. p. 57). Bokan testified that Deputy Dausch had contacted her, but she had not instructed Deputy Dausch that S.W. needed to talk to her before she could be released. Bokan further testified that Deputy Dausch could have dropped S.W. off at home because "she didn't need to come down there and talk to [her]." (Tr. p. 88). However, after Bokan spoke with S.W., Bokan determined that S.W. did not want to go home and needed to be placed in a shelter facility for the time being.
During the hearing, the trial court admitted over objection evidence that S.W. had been given a drug test which indicated that S.W. had used marijuana. S.W. clarified that the marijuana in her system was present due to her drug usage at graduation parties which had occurred approximately one month prior to the incidents on June 24th.
At the close of the hearing the trial court took the matter under advisement. On July 30, 2009, the trial court issued a written order affirming DCS's intervention, ordered relative placement in the Peru school district so that S.W. could attend Peru High School, and set the matter for dispositional hearing on August 19, 2009. On August 19, 2009, the trial court held a hearing. The sole focus of the hearing was S.W.'s then current placement. She was living with her aunt, but a pre-dispositional statement submitted to the trial court stated that S.W. was staying with her parents. A representative for the DCS clarified that the aunt's home had been approved for S.W. also, and stated that DCS had no objection to S.W. residing there. At the close of the hearing, the trial court ordered S.W. to submit to a drug screen and set another hearing for December 16, 2009. Later that same day, the trial court issued its order on the DCS's CHINS petition. In doing so, the trial court incorporated findings from the DCS pre-dispositional report, specifically the paragraphs stating:
Reasons for Current DCS Involvement []: On June 24, 2009, at approximately 11:02 pm, the Miami County DCS Office received a concern involving 17-year [-] old [S.W.] According to Law Enforcement Officers, [S.W.] was located with another female juvenile who had been reported as a runaway. Officers contacted [S.W.'s] parents who informed the police that they did not want their daughter returned back home. Officers explained that [Father] hung-up the telephone on them and refused to answer the remaining phone calls. FCM Angela Bokan additionally attempted to contact [S.W.'s] family; however, they also would not answer any of her calls. [S.W.] was detained and placed at White's Residential and Family Services in Shelter Care.
* * *
Social Background [ ]: [S.W.] attends [] Church in Peru, Indiana. [S.W.] is friendly and gets along with her peers and her family. [S.W.] volunteers [] where her mother works. She enjoys working with the elderly residents.
* * *
The following DISPOSITIONAL OPTIONS were considered and evaluated *787 in relation to the plan of care, treatment, rehabilitation or placement for the child(ren): Because of the nature of the allegations contained in the Child in Need of Services petition, and other information obtained during the investigation or during the current action, the following dispositional options were considered: [Mother] stated that [S.W.] does not have any problems with drugs or alcohol. However, since [S.W.] tested positive for marijuana upon her removal, the DCS recommends that [S.W.] should submit to random drug screens, with the possibility of having to attend IOP classes at Four County Counseling Center if she tests positive for drugs.
(Appellant's App. pp. 42, 44, and 46) (bold in original). In addition, the trial court found:
(1) The Court's disposition is consistent with the safety of the community and the best interest of the child;
(2) The Court's disposition is the least restrictive (most family like) and most appropriate setting available;
(3) The Court's disposition provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.
(Appellant's App. p. 10). Based on these findings, the trial court determined that S.W. is a CHINS.
S.W. now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. Standard of Review

A CHINS proceeding is a civil action, and thus, the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. Ind.Code § 31-34-12-3; In re N.E., 919 N.E.2d 102, 105 (Ind.2010). Indiana Code sections 31-34-1-1 through 11 specify the elements of the CHINS definition that the State must prove. Each section requires that the State prove that the child is under the age of eighteen and "needs care, treatment, or rehabilitation that: (A) the child is not receiving; or (B) is unlikely to be provided or accepted without the coercive intervention of the court."[2] The trial court found S.W. to be a CHINS pursuant to Indiana Code section 31-34-1-1, which requires, in addition to the requirements stated above, that the State prove "the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision."
When we review a case where the trial court has entered findings of fact and conclusions of law, we will not set aside the judgment of the trial court unless it is clearly erroneous. In re J.Q., 836 N.E.2d 961, 966 (Ind.Ct.App.2005). The trial court's findings of fact, conclusions of law and judgment are considered to be clearly erroneous only if a review of the whole record leads us to a definite and firm conviction that a mistake has been made. Id. We will neither reweigh the evidence nor judge the credibility of the witnesses. Id. "Instead, we consider only the evidence and reasonable inferences drawn therefrom which support the judgment." Id.

*788 II. Evidence of S.W.'s Drug Use

S.W. contends that the trial court abused its discretion when it admitted evidence of S.W.'s drug use. Specifically, S.W. contends that evidence that she had used drugs was developed through an illegal search and is irrelevant to the allegations in the CHINS petition submitted by DCS.
We review a trial court's decision to admit or exclude evidence for an abuse of discretion. Payne v. State, 854 N.E.2d 7, 13 (Ind.Ct.App.2006), trans. denied. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the trial court. Id. If a trial court abuses its discretion by admitting the challenged evidence, we will only reverse for that error if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." Id. (quoting Iqbal v. State, 805 N.E.2d 401, 406 (Ind.Ct.App.2004)). Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted. Id.
S.W. contends that the result of her drug test should not have been admissible because it was administered when she was illegally detained. But for reasons we will explain below, we disagree with the contention that she was illegally detained. At the time of S.W.'s drug test, the DCS had probable cause to believe that S.W. was a CHINS due to a lack of supervision by her parents and had appropriately sought and received a judicial order for temporary custody.
Additionally, S.W. contends that the results of her drug test should not have been admissible because she was not given the opportunity to consult with an attorney or her parents prior to taking the drug test. The legal authority which S.W. cites to develop this argument is Indiana Code section 31-37-8-4 and In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). However, both Indiana Code section 31-37-8-4 and In re Gault specifically deal with delinquency proceedings as opposed to CHINS proceedings or equivalent child protection actions. S.W. faced no allegations that she was a juvenile delinquent. S.W. cites no authority which would support a claim that DCS cannot have a child in its custody for that child's protection submit to a drug test.
Alternatively, S.W. contends that the evidence of her drug use is irrelevant. We disagree. The DCS alleged that S.W. was a CHINS primarily due to a lack of parental supervision. Although an adequately supervised teenager may find ways in which to experiment with illicit drugs, a child's drug use can be a direct product of a lack of parental supervision. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable then it would be without the evidence." Ind. Evidence Rule 401. S.W.'s drug use could be a direct result of a lack of parental supervision, and, therefore, the evidence of her drug use was relevant to the CHINS proceedings.
S.W. also contends that she was provided no notice "that her drug use would be litigated at the CHINS hearing prior to DCS's attempt to admit such evidence. The CHINS petition alleged, pursuant to I.C. XX-XX-X-X, only neglect by her parents in the form of inadequate supervision and refusal to take custody on June 24, 2009." (Appellant's Br. p. 16). However, we do not read the CHINS petition as being so limited.
*789 "The function of the issues, whether formed by pleadings, pre-trial orders, or contentions of the parties, is to provide a guide for the parties and the court as they proceed through trial." In re V.C., 867 N.E.2d 167, 178 (Ind.Ct.App.2007). By citing Indiana Code section 31-34-1-1 as the authority by which S.W. was a CHINS, DCS alleged that S.W.'s parents were not supplying her with adequate "necessary food, clothing, shelter, medical care, education, or supervision." Lack of adequate parental supervision was undoubtedly the focus of the proceedings. S.W. states that she "could not expect that her own actions would be at the center of the CHINS finding," apparently assuming that parental supervision would focus only on actions of the parents. (Appellant's Br. p. 17). However, as we have discussed above, S.W.'s drug use could be a product of a lack of parental supervision.
Along with the legal authority cited by DCS, the factual allegations in the CHINS petition also provided notice to S.W. that her drug use could be at issue. The CHINS petition explicitly states that S.W. "reported to this [Family Case Manager] that domestic violence, drug use, and abuse has continued to occur in the home following DCS's previous involvement with the family approximately one year prior." (Appellant's App. p. 14). This statement put S.W. and her parents on notice that the drug use of any person living in S.W.'s home could be an issue of the CHINS proceeding. This would include S.W. In addition to the allegations in the CHINS petition, DCS provided the result of S.W.'s drug test to S.W.'s counsel and her parents prior to the factual hearing. Altogether, we conclude that S.W. and her parents had ample notice that her drug use could be an issue in the CHINS proceedings.

III. Sufficiency of the Evidence

S.W. contends that the DCS did not present sufficient evidence to prove by a preponderance of the evidence that she was a CHINS. Specifically, S.W. argues that DCS did not prove that her physical or mental condition was seriously endangered as a result of her parent's refusal or neglect in providing necessary supervision.
Deputy Dausch located S.W. walking along County Road 900 South in a rural part of Miami County at approximately 10:45 p.m. S.W. lived approximately twelve miles away in Peru, Indiana. Deputy Dausch testified that out of concern for her safety, he called her parents to have them come pick her up. While speaking to S.W.'s mother, S.W.'s father cut in and "stated along the lines that we were the police, we needed to deal with it, they weren't coming to get her, and the phone went dead." (Tr. p. 47). So Deputy Dausch dealt with the situation as S.W.'s father requested: he called DCS and transported S.W. to the police station. To further explain why he took these actions, Deputy Dausch testified:
She [S.W.] wasn't breaking any rules, she wasn't doing anything wrong, but it's late at night, we're out in the middle of nowhere and she's 17, I wouldn't leave any child out like that. That's why I contacted the parents first to see if they would come get her. We're not a taxi service, so we don't we're not in the habit of just giving rides to kids, take them home and things like that, or anybody. Once the parents hung up on me, then I had, my next recourse was the Child Protective Services.
(Tr. p. 46). S.W.'s mother also testified that it was not safe for her daughter to be out in the country.
S.W. contends that her parents' refusal to come get her did not rise to the level of seriously endangering her physical or *790 mental condition because the police station was located approximately six blocks from their home. She repeatedly argues that she could have just walked home or the police could have driven her home. Alternatively, she contends that she had already informed Deputy Dausch that she had a ride coming and that he could have simply let her go with her ride. However, S.W.'s complaints about the actions of the police that evening carry little weight because her father told Deputy Dausch to handle the situation.
Be that as it may, possibly more demonstrative of S.W.'s parents refusal or neglect to provide adequate supervision endangering her physical or mental condition is the fact that when S.W. did not return home that night her parents did not inquire about her whereabouts. Instead, they chose to ignore repeated phone calls to their home. It was at that point that Bokan decided it was time to seek an order for temporary custody so that DCS could ensure S.W.'s safety. Soon thereafter, S.W. told Bokan that domestic violence, drug use, and abuse had been occurring in her household. S.W. later denied having made that statement, but we cannot reweigh the credibility of the witnesses or the evidence. J.Q., 836 N.E.2d at 966. For these reasons, we conclude that DCS presented sufficient evidence to prove by a preponderance of the evidence that S.W.'s physical or mental condition was seriously endangered by her parent's refusal or neglect to provide necessary supervision.

CONCLUSION
Based on the foregoing, we conclude that the trial court did not abuse its discretion when it admitted evidence of S.W.'s drug use at the fact finding hearing and the DCS presented sufficient evidence to prove that S.W. is a CHINS.
Affirmed.
VAIDIK, J., concurs.
CRONE, J., concurs in result.
NOTES
[1] Both S.W. and her parents filed notices of appeal by their respective trial counsel, but only one Appellant's Brief has been filed before us naming S.W. as the Appellant.
[2] Sections 1 through 8 recite the language "A child is a child in need of services if before the child becomes eighteen (18) years of age," but sections 9 through 11 do not. However, sections 9 through 11 clearly refer to children and our supreme court's recent opinion in In re N.E. generalizes that all eleven sections require that the State prove "the child is under the age of 18." Id. at 105.