**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEES:

**PATRICK M. RHODES**
Marion County Department of Child Services
Indianapolis, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

May 14 2012, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARNET-CHILD RELATIONSHIP OF: F.R. and Z.R. (Minor Children), | ) ) ) ) | |
| And | ) ) | |
| P.R. (Father), | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 49A02-1110-JT-1007 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES | ) ) ) | |
| Appellee-Petitioner, | ) ) | |
| And | ) ) | |
| CHILD ADVOCATES, INC. | ) ) | |
| Guardian Ad Litem. | ) | |

The Honorable Gary Chavers, Judge Pro Tem
The Honorable Larry Bradley, Magistrate
Cause Nos. 49D09-1104-JT-14848
49D09-1104-JT-14849

**May 14, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**ROBB, Chief Judge**

<u>Case Summary and Issues</u>

P.R. ("Father") appeals the involuntary termination of his parental rights to his children, F.R. and Z.R., alleging there is insufficient evidence supporting the juvenile court's judgment. Father also claims he was denied due process of law during the underlying child in need of services ("CHINS") proceedings and that the juvenile court committed reversible error by admitting improper hearsay evidence over Father's timely objection. Concluding that (1) clear and convincing evidence supports the juvenile court's judgment; (2) Father was not denied due process of law; and (3) the challenged hearsay testimony was cumulative of Father's own, properly admitted testimony and therefore harmless, we affirm.

Father is the legal father of F.R., born in August 2005, and Z.R., born in July 2007.[2] The facts most favorable to the juvenile court's judgment reveal that in March 2010 both children were removed from their mother's care and placed in the care of their maternal aunt due to the mother's failure to successfully complete an ongoing Informal Adjustment[3] ("I.A.") with the local Marion County office of the Indiana Department of Child Services ("MCDCS"), coupled with the mother's lack of stable housing.[4] At the time, Father was no longer living in Indiana. At the time the children were removed, MCDCS family case manager Amanda Klene obtained Father's telephone number and called him in Chattanooga, Tennessee. Klene informed Father that the children had been detained and that MCDCS planned to file petitions with the juvenile court alleging both F.R. and Z.R. were CHINS. When Father told Klene he intended to return to Indiana the following weekend and take the children back to Tennessee with him, Klene advised Father that the children could not be

---

[1] Father has filed a Motion for Leave to Amend Reply Brief of Respondent/Appellant by Retrieving Brief and Substituting Pages, pointing out an error in the caption on the cover page and a typographic error in the body of the brief. The motion is granted and the errors are considered corrected without the necessity for physically amending the brief.

[2] Although paternity testing was never performed and the parents were never married, Father was in a relationship with the mother at the time of the children's births and signed both children's birth certificates.

[3] A program of Informal Adjustment is a negotiated agreement between a family and a local office of the Indiana Department of Child Services whereby the family agrees to participate in various services provided by the county in an effort to prevent the child/children from being formally deemed CHINS. See Ind. Code § 31-34-8 et seq.

[4] The parental rights of the children's biological mother, M.F., were also involuntarily terminated by the juvenile court's October 2011 termination order. Although M.F. initially participated in reunification services following the children's removal, she soon disengaged from services and eventually ceased all communications with MCDCS case managers. In addition, M.F. failed to appear for the termination hearing and does not participate in this appeal. Consequently, we limit our recitation of the facts to those pertinent

removed from the State of Indiana while there was an open case with MCDCS. Klene further explained that Father needed to return to Marion County to attend any court hearings and that upon returning to Indiana he could contact MCDCS to request visitation privileges and/or reunification services if needed. Klene then provided Father with all of her contact information. When Klene, in turn, asked for Father's current mailing address, he refused to provide it.

On March 10, 2010, CHINS petitions were filed as to both children. Both children were so adjudicated later the same month. Although Klene and Father had exchanged multiple voicemail messages following their initial conversation, she was never able to have another live telephone conversation with Father, nor obtain his address. Klene did, however, speak with Father's girlfriend in Tennessee, as well as Father's mother ("Grandmother"), who continued to reside in Indiana and exercise visitation with the children.

A dispositional hearing was held in April 2010. Father failed to appear. Following the hearing, the juvenile court entered an order formally removing the children from their mother's custody and adjudicating them wards of MCDCS. As for Father, the juvenile court ordered the dispositional hearing continued and scheduled a default hearing for July 2010. MCDCS thereafter attempted service on Father by publication on April 16, April 23, and April 30, 2010.

The default hearing was held on July 15, 2010. Father failed to appear, and the juvenile court entered a default judgment against Father. Father subsequently failed to

solely to Father's appeal.

4

appear for the continued dispositional hearing held on September 2, 2010, and the juvenile court entered an order formally removing both children from Father's custody. The court's dispositional order further directed that no services were to be provided to Father "until he appears" in court. Ex. at 29.

Throughout the remainder of the CHINS case, Father failed to initiate any contact with MCDCS and declined to request visitation with the children. In addition, the children's mother continued to struggle with her addiction to cocaine and eventually ceased all contact with MCDCS and service providers. Consequently, MCDCS requested that the juvenile court change the children's permanency plan from reunification to termination of parental rights. The court granted MCDCS's request on April 14, 2011, and MCDCS filed a petition seeking the involuntary termination of Father's parental rights to F.R. and Z.R. the same day.

Meanwhile, Father returned to Indiana sometime in March 2011. Although Father was living with Grandmother, he made no attempt to contact MCDCS until after the filing of the involuntary termination petition. In May 2011, Father appeared in court for the first time during a pre-trial conference. Father was appointed counsel at that time. Immediately following the hearing, MCDCS family case manager Elizabeth Waskom-Sisco asked Father if he would submit to a drug screen. Father agreed to be tested the next day. He informed Waskom-Sisco, however, that the test would be positive for marijuana. Test results later confirmed Father tested positive for Tetrahydrocannabinol ("THC"), the active hallucinogenic chemical found in marijuana.

During a termination pre-trial hearing in July 2011, Father requested reunification services. Father's request for services was denied by the juvenile court. Father was informed, however, that he could seek services on his own. To that end, case manager Waskom-Sisco advised Father that he should complete (1) a substance abuse assessment, (2) a parenting assessment, and (3) home-based counseling services if he wished to work toward regaining custody of the children. Approximately one week later, Waskom-Sisco reiterated these recommendations in a letter mailed to Father at the home he shared with Grandmother. In the letter, Waskom-Sisco also provided Father with her contact information and offered to meet with Father to help him identify and obtain appropriate service providers should he decide to seek services on his own. Father never contacted Waskom-Sisco.

An evidentiary hearing on the termination petition concerning both children was eventually held in October 2011. At the time of the termination hearing, Father was unemployed, continued to live with Grandmother in a two-bedroom apartment that did not have beds for the children, and had failed to participate in any of the recommended reunification services. During the hearing, MCDCS also presented evidence regarding Father's refusal to return to Indiana and/or to maintain contact with MCDCS for approximately one year despite his actual knowledge that F.R. and Z.R. had been removed from their mother's care and that MCDCS planned to initiate CHINS proceedings.

Additional evidence submitted during the termination hearing established Father had left the children with their mother in Indiana and moved to Tennessee in 2008 notwithstanding his knowledge that the mother was struggling with significant substance

6

abuse issues. Father also never sought visitation privileges with the children, even after returning to Indiana, and the children did not possess any significant relationship and/or bond with Father, who left Indiana when Z.R. was eight-months-old.

At the conclusion of the hearing, the juvenile court took the matter under advisement. On October 7, 2011, the court issued an order terminating Father's parental rights to F.R. and Z.R. Father now appeals.

Discussion and Decision

I. Standard of Review

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing the termination of parental rights, we will neither reweigh the evidence nor judge witness credibility. In re D.D., 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. Id. Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied, cert. denied, 534 U.S. 1161 (2002).

Here, in terminating Father's parental rights, the juvenile court entered specific findings and conclusions. When a juvenile court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether

7

the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. L.S., 717 N.E.2d at 208.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a juvenile court must subordinate the interests of the parent to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)     There is a reasonable probability that the continuation of the  parent-child relationship poses a threat to the well-being of the child . . . .

8

Ind. Code § 31-35-2-4(b)(2).  "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  If the court finds the allegations in a petition for termination are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Father challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) of Indiana's termination statute quoted above.  See Ind. Code § 31-35-2-4(b)(2)(B).  Father also claims he was denied due process of law during the underlying CHINS proceedings and that the juvenile court committed reversible error in admitting certain hearsay statements over his timely objection.  We shall address each allegation of error in turn.

## II.  Sufficiency of the Evidence

We first observe that Indiana Code section 31-35-2-4(b)(2)(B) requires the juvenile court to find that only one of the requirements of subsection (b)(2)(B) has been established by clear and convincing evidence before an involuntary termination of parental rights may occur. Here, the court determined that subsections (b)(2)(B)(i) and (ii) were both proven. Because we find it to be dispositive under the facts of this case, we consider only whether MCDCS established, by clear and convincing evidence, subsection (b)(2)(B)(i), namely, that there is a reasonable probability the conditions resulting in the children's removal or continued placement outside Father's care will not be remedied.  See Ind. Code § 31-35-2-4(b)(2)(B)(i).

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The juvenile court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. Moreover, a county department of child services is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, in terminating Father's parental rights, the juvenile court made detailed findings regarding Father's historical lack of involvement in the children's lives and ongoing inability to meet the children's basic needs. In so doing, the juvenile court found Father had "abandoned his children to their substance[-]abusing mother with whom [Father] did not feel safe," in April of 2008 to reside in Tennessee, that he did not return to Indiana until approximately March 2011, and that he had "paid no support during this time." Appellant's Appendix at 20-21. The juvenile court further described Father's employment as not being "stable" or "adequate to meet the children's needs," noting that Father characterized his employment as "seasonal," and did not present any evidence during the termination hearing

10

of trying to obtain other employment, either as a supplement or replacement. Id. at 20. In addition, the court specifically found that, notwithstanding his testimony to the contrary, Father had actual knowledge of the CHINS matter and hearings. The court further found Father had "ignored the CHINS proceedings until returning to Indiana, and since his return has taken no steps to participate in services designed to ensure that he could provide a safe environment free from substance abuse, adequate housing[,] and an ability to meet the children's needs." Id. at 21.

A thorough review of the record makes clear that F.R. and Z.R. were removed from their mother's care due to her housing instability and failed I.A. Although Father no longer lived in Indiana, he was immediately contacted by MCDCS case manager Klene who informed Father of the children's removal. Klene testified during the termination hearing that she personally telephoned Father in March 2010 and explained to him that the open I.A. with MCDCS was being "switched over to a CHINS [case]" and that Father "needed to come to [c]ourt in order to see his children and be offered any services," but that Father failed to do so. Transcript at 30. Klene also confirmed that apart from an initial game of "phone tag" during which she and Father exchanged several voicemail messages in April and May of 2010, Father never again contacted Klene, never appeared in court, and never showed "any indication that he was ready, willing, and able to parent his children." Id. at 21, 23.

Similarly, current MCDCS family case manager Waskom-Sisco informed the juvenile court that Father made no attempts to contact MCDCS prior to the permanency hearing in April 2011. Waskom-Sisco also testified that although she "offered to meet with [Father]"

11

and "locate providers" if he was willing to pursue reunification services on his own during the termination case, Father never contacted her and never participated in any services on his own. Id. at 53. In addition, Waskom-Sisco stated Father never asked for visitation privileges, failed to obtain stable employment once returning to Indiana, and continued to live with Grandmother in a two-bedroom home where he slept on an air mattress and did not have beds for the children.

Father's own testimony lends further support to the juvenile court's findings. During the termination hearing, Father admitted that he spoke with case manager Klene at the time the children were removed from the family home in March 2010. He also confirmed that MCDCS did not have "an address to call [sic]" during the CHINS case. Id. at 82. In addition, Father acknowledged that he failed to initiate any contact with MCDCS upon returning to Indiana in March 2011 and never accepted Waskom-Sisco's offer of assistance in locating providers for the recommended reunification services. Finally, when asked whether she believed Father should be provided more time to demonstrate his ability to parent the children, Guardian ad Litem Alane Singleton answered, "No, I believe [MCDCS] gave [Father] sufficient time to get involved with the case and to step up and be a parent to his children . . . ." Id. at 73.

As noted earlier, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. Moreover, where a parent's "pattern of conduct shows no overall

progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." In re A.H., 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Father's arguments to the contrary amount to an impermissible invitation to reweigh the evidence, which we decline to accept. See D.D., 804 N.E.2d at 267. Our review of the record leaves us satisfied that MCDCS presented clear and convincing evidence to support the juvenile court's findings cited above.

## III. Due Process

Next, we consider Father's contention that he was denied due process of law during the underlying CHINS proceedings. A parent's interest in the care, custody, and control of his or her children is arguably one of the oldest of our fundamental liberty interests. Bester, 839 N.E.2d at 147. Hence, "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." M.B., 666 N.E.2d at 76. The Due Process Clause of the United States Constitution likewise "prohibits state action that deprives a person of life, liberty, or property without a fair proceeding." In re B.J., 879 N.E.2d 7, 16 (Ind. Ct. App. 2008) (citations omitted), trans. denied. To be sure, the right to raise one's child is an "essential, basic right that is more precious than property rights." In re C.C., 788 N.E.2d 847, 852 (Ind. Ct. App. 2003), trans. denied. Thus, when the State seeks to terminate a parent-child relationship, it must do so in a manner that meets the constitutional requirements of the Due Process Clause. Hite v. Vanderburgh Cnty. Office of Family & Children, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006).

13

Although due process has never been precisely defined, the phrase embodies a requirement of "fundamental fairness." Id. (citation omitted).

Notwithstanding the significance of the rights involved herein, it is well-established, however, that a party on appeal may waive a constitutional claim. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 194 (Ind. Ct. App. 2003). In particular, we have previously held that a parent may waive a due process claim in a CHINS or involuntary termination case when it is raised for the first time on appeal. Id. at 194-95; see also K.S., 750 N.E.2d at 834 n.1 (concluding mother waived claim that trial court violated her due process rights in failing to follow statutory requirements governing permanency hearings, case plans, and dispositional orders because she raised constitutional claim for first time on appeal). This is consistent with the long-standing general rule that an issue cannot be raised for the first time on appeal. McBride, 798 N.E.2d at 194.

Here, Father asserts for the first time on appeal that MCDCS failed to "follow statutory requirements to provide notice to [Father]." Brief of Appellant at 18. Father also complains that he never received a case plan and that these procedural irregularities combined to deprive him of procedural due process in the termination case. Although Father acknowledges that the termination statute does not require MCDCS to provide reunification services, he nevertheless asserts the juvenile court erred in denying his request for services during a pre-trial conference in July 2011.

A review of the record makes clear that Father did not object to any of these alleged deficiencies during the CHINS case. Moreover, although Father was appointed counsel

during the termination proceedings and attended the evidentiary hearing, he never argued during the termination proceedings that the alleged deficiencies during the CHINS case constituted a due process violation in the termination case. Rather, Father has raised his procedural due process claim for the first time on appeal. We therefore conclude that Father has waived his constitutional challenge.

Waiver notwithstanding, we pause to note that by refusing to provide MCDCS with his address and failing to maintain contact with case manager Klene for over one year despite his knowledge in March 2010 that the children had been removed from their mother and that CHINS petitions were being filed, Father has invited, at least in part, the alleged error of which he now complains. Error invited by the complaining party is not reversible error. See, e.g., Breining v. Harkness, 872 N.E.2d 155, 159 (Ind. Ct. App. 2007) (stating that the doctrine of invited error, grounded in estoppel, provides that a party may not take advantage of an error that he commits, invites, or which is the natural consequence of his own neglect or misconduct), trans. denied.

Nor can we agree with Father's assertion that the alleged procedural irregularities which occurred in the CHINS proceedings operated to deprive Father of procedural due process in the termination case. In the present case, Father was represented by counsel throughout the termination proceedings, attended the termination evidentiary hearing in person, and was provided with an opportunity to be heard and to cross-examine witnesses. Moreover, during the termination hearing Father confirmed that he attended virtually all of the pre-trial hearings in the termination case, was informed of the reunification services

15

recommended by MCDCS, and was offered assistance in locating service providers. For all these reasons, we cannot conclude Father's rights were fatally compromised. See, e.g., Hite, 845 N.E.2d at 184 (concluding that failure to provide father with notice during initial stages of the CHINS action and copies of case plans did not substantially increase risk of error in termination proceedings).

## IV. Admission of Evidence

Finally, we consider Father's assertion that the juvenile court abused its discretion by admitting hearsay testimony alleging Father never paid any child support to the children's mother. Specifically, Father contends that because the juvenile court relied on this improper hearsay evidence in its findings to support termination of Father's parental rights, he is entitled to reversal. We disagree.

The admission of evidence is entrusted to the sound discretion of the juvenile court. In re A.J., 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), trans. denied. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. Id. If a juvenile court abuses its discretion by admitting the challenged evidence, we will only reverse for that error if the error is inconsistent with substantial justice or if a substantial right of the party is affected. In re S.W., 920 N.E.2d 783, 788 (Ind. Ct. App. 2010). Moreover, any error caused by the admission of evidence is harmless error, for which we will not reverse, if the erroneously admitted evidence was cumulative of other evidence properly admitted. Id.

16

During the termination hearing, when asked, "[A]fter you moved to Tennessee, uh, did you send child support payments to [Mother]," Father answered, "No, sir." Tr. at 86. Thus, even assuming without deciding that the challenged testimony was improperly admitted into evidence, such evidence was merely cumulative of Father's own, properly admitted testimony. We therefore find no error.

## Conclusion

This court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error occurred in this case. The judgment of the juvenile court terminating Father's parental rights to both F.R. and Z.R. is therefore affirmed.

Affirmed.

BAILEY, J., and MATHIAS, J., concur.