Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 13 2012, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEES:

**PATRICK M. RHODES**
Indiana Dept of Child Services

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
E.Y., Minor Child, )
 )
A.Y., Mother, )
 )
    Appellant-Respondent, )
 )
        vs. )    No. 49A04-1112-JT-702
 )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
 )
        and )
 )
CHILD ADVOCATES INC., )
 )
    Appellees-Petitioners. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry Bradley, Magistrate
Cause No. 49D09-1106-JT-21488

**August 13, 2012**

**BROWN, Judge**

A.Y. ("Mother") appeals the involuntary termination of her parental rights to her child, E.Y. Concluding that: (1) there is sufficient evidence to support the juvenile court's judgment; and (2) the juvenile court did not abuse its discretion in admitting evidence of Mother's prior involvement with the Indiana Department of Child Services during the termination hearing, we affirm.

## Facts and Procedural History

Mother is the biological mother of E.Y., born in January 2006.[1] The evidence most favorable to the juvenile court's judgment reveals that E.Y. was taken into emergency protective custody after the local Marion County office of the Indiana Department of Child Services ("MCDCS") received and substantiated a report of neglect involving the family due to the "deplorable condition" of the family home. Petitioner's Ex. 1, p. 4. During MCDCS's assessment of the matter, the investigating family case manager observed the home to be littered with dog feces and trash. An "unbearable" stench permeated the house, the stairs were observed to be "rotting and some were missing," and there was so much clutter and debris inside that it was "difficult to walk" throughout the home. Id. In addition, at the time of the assessment, there was no food in the home, Mother's live-in boyfriend (and originally alleged father of E.Y.) admitted to

---

[1] The parental rights of E.Y.'s biological father, J.Y. ("Father"), were also terminated by the juvenile court. Father does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Mother's appeal.

using marijuana, and neither Mother nor her boyfriend had the financial means to provide E.Y. with basic care and life necessities.

Following E.Y.'s removal, MCDCS filed a petition alleging E.Y. was a child in need of services ("CHINS"). Mother admitted to the allegations contained therein, objecting only to MCDCS's allegation that there was no food in the home. E.Y. was adjudicated a CHINS on the same day, and a dispositional hearing was scheduled for approximately two weeks later.

On May 17, 2010, the juvenile court entered a dispositional order formally removing E.Y. from Mother's care and declaring the child to be a ward of MCDCS. The dispositional order also incorporated a Participation Decree and directed Mother to participate in a variety of tasks and services designed to help her improve her parenting deficiencies and to facilitate reunification of the family. Specifically, Mother was ordered to, among other things: (1) participate in a parenting assessment and follow all resulting recommendations, including any parenting classes or counseling recommendations; (2) successfully complete home-based counseling; (3) obtain and maintain a stable, legal source of income; (4) secure stable and suitable housing with functioning utilities and ample food supply; and (5) exercise regular supervised visitation with E.Y.

Mother's participation in reunification services was sporadic from the beginning and, despite brief periods of improvement, was ultimately unsuccessful. To Mother's credit, she successfully completed a drug and alcohol assessment and produced a year of clean random drug screens. Mother also participated in a parenting assessment, but she refused to take part in the recommended parenting classes. Because of a childhood

diagnosis of bi-polar disorder and post-traumatic stress disorder, Mother was also ordered to participate in a psychological evaluation. Mother submitted to the evaluation, but again failed to follow through with the recommended counseling.

Mother also failed to successfully complete any of her home-based counseling goals. These goals, which were developed by Mother and her home-based counselor, included pursuing higher education for better employment opportunities, obtaining and maintaining appropriate housing, and improving her money management abilities. Although Mother enrolled at Ivy Tech on multiple occasions throughout the CHINS case, she failed to attend any classes. Mother also bounced between multiple residences, regularly struggled to pay her rent and utility bills from month to month, and maintained only sporadic and part-time employment.

Eventually, in June 2011, MCDCS filed a petition seeking the involuntary termination of Mother's parental rights to E.Y. A two-day evidentiary hearing on the termination petition thereafter commenced in October 2011 and was concluded in December 2011. During the termination hearing, MCDCS presented significant evidence establishing Mother had failed to successfully complete a majority of the juvenile court's dispositional goals, including participating in parenting classes, obtaining housing and employment stability, engaging in mental health counseling, and visiting regularly with E.Y., despite having had a wealth of services available to her for approximately eighteen months.

As for E.Y., MCDCS presented evidence showing the child had been diagnosed with reactive attachment disorder, sexual abuse of a child, and neglect of a child. At the

4

time of E.Y.'s removal from Mother's care, then four-year-old E.Y. was also unable to use utensils when eating, did not possess adequate personal hygiene skills when using the bathroom, and suffered from a medical condition involving her hip. By the time of the termination hearing, however, E.Y.'s hip condition, personal hygiene issues, and difficulties with using utensils while eating had all been resolved. In addition, the child was happy and thriving in foster care and was currently in the process of transitioning into a new, pre-adoptive foster care home with "family friends" of the child's previous foster parents, who lived in the same community and had known E.Y. for several months. Transcript at 59.

Also during the termination hearing, MCDCS entered evidence concerning Mother's previous involvement with MCDCS with regard to one of E.Y.'s older siblings, A.H.[2] This evidence, which was admitted over Mother's objection, established that when Mother was seventeen years old, she, too, was a CHINS when she gave birth to A.H. Twelve days later, MCDCS filed a petition alleging A.H. was a CHINS due to Mother's failure to provide A.H. with a clean and sanitary home environment at the Independent Living placement she was residing in at the time. The CHINS petition also alleged Mother had tested positive for marijuana and had failed to provide A.H. with proper supervision. Mother later signed consents for A.H. to be adopted.

---

[2] The record reveals that Mother has a third biological child, J.M. At or around the time E.Y. was removed from Mother's care, Mother signed a temporary guardianship allowing J.M. to be placed in the care of Mother's cousin in order to keep J.M. out of "the system." Transcript p. 5. J.M. therefore is not subject to this appeal. The temporary guardianship was set to expire during the summer of 2012.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On December 5, 2011, the juvenile court entered its judgment terminating Mother's parental rights to E.Y. Mother now appeals.

**Discussion and Decision**

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. When, as here, the juvenile court makes specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a juvenile court need not wait until a

6

child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

> (B)     that one (1) of the following is true:
>
> > (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services . . .

Ind. Code § 31-35-2-4(b)(2).[3]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Mother challenges the sufficiency of the evidence supporting the juvenile court's findings as to subsection (b)(2)(B) of the termination statute cited above. Mother also claims she is entitled to reversal because the juvenile court abused its discretion in admitting evidence of her prior involvement with MCDCS over her objection. We shall address each argument in turn.

---

[3] We observe that Ind. Code § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

## I. Conditions Remedied/Threat to Children's Well-Being

In challenging the sufficiency of the evidence supporting the juvenile court's determination that there is a reasonable probability the conditions resulting in E.Y.'s removal and continued placement outside her care will not be remedied, Mother asserts that MCDCS "became involved because [of] the condition of [Mother's] home and because of allegations of drug use" and that these conditions had been remedied by the time of the termination hearing. Appellant's Brief at 19. Mother also asserts that the fact she "did not go to college [and] did not complete parenting or mental health services did not warrant termination without a showing by clear and convincing evidence that these things made her unable to care for [E.Y.]." Id. at 12.

Initially, we observe that Ind. Code § 31-35-2-4(b)(2)(B) requires the State to establish, by clear and convincing evidence, only one of the three requirements of subsection (b)(2)(B). Because we find it to be dispositive, we limit our review to Mother's allegations pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute. In determining whether there exists a reasonable probability that the conditions resulting in a child's removal or continued placement outside a parent's care will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect,

failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. A juvenile court may also properly consider the services offered to the parent by a county department of child services and the parent's response to those services as evidence of whether conditions will be remedied. Id.

Here, in terminating Mother's parental rights to E.Y., the juvenile court made numerous findings detailing the many reunification services provided to Mother for approximately eighteen months, as well as Mother's failure to participate in and/or benefit from these services. In so doing, although the juvenile court acknowledged Mother's participation in random drug testing, a parenting assessment, and psychological evaluation, the court went on to find that Mother "failed to follow up" on the resulting recommendations to participate in parenting classes and individual counseling. Appellant's Appendix at 11. The court also noted the testimony of home-based counselor Catherine Quay ("Quay"), who informed the juvenile court that she believed Mother's mental health issues had been "untreated" and remained "an issue" due to Mother's failure to follow-up with the recommended counseling after being evaluated. Id. at 12.

As for Mother's home-based counseling goals, the juvenile court found Mother had been "unsuccessful" in pursing her goal of obtaining higher education for employment purposes, noting she had "enrolled multiple times at Ivy Tech, but failed to attend." Id. The court's findings also acknowledged Mother's ongoing "struggle" to pay her rent and utility obligations from "month to month," as well as Mother's history of employment, which the court found "may have been sporadic and with part-time

9

employment" due to Mother's refusal to provide MCDCS with any verification of employment, though it was requested. Id.

As for Mother's goal of achieving stable housing, the juvenile court specifically found that Mother had obtained "several residences" during the CHINS case, but had never acquired "independent housing." Id. The court went on to note that, as of the first day of the termination hearing, Mother had been living at her current residence for only one-and-a-half months. The juvenile court further found:

> 28. After one year of home[-]based services, [Mother] is not in a position to provide safe, stable housing or to meet [E.Y.'s] basic needs. [Mother] has a history of being unable or unwilling to remedy conditions in a previous CHINS case which resulted in her child being adopted. Given this history and the minimal progress she has made in the adequate time frame, [Mother] will not be able to remedy conditions in the future.
>
> * * *
>
> 29. [E.Y.] presented with signs of neglect after her removal in May 2010. Parenting classes have not been taken. [Mother] has been involved in violent relationships, with abuse taking place in front of [E.Y.]. [Mother] has not maintained stable housing or adequate income. Mental health counseling has not been obtained. Without these issues being successfully addressed, [Mother] cannot provide a safe, stable[,] and consistent environment for [E.Y.], and meet her basic or special needs.

Id. at 12-13. A thorough review of the record reveals that abundant evidence supports the juvenile court's findings set forth above.

During the termination hearing, MCDCS case manager Brittany Smith ("Smith") recommended termination of Mother's parental rights. In so doing, Smith informed the juvenile court that Mother had been "unsuccessfully discharged" from home-based counseling. Smith further testified that Mother's housing had been "unstable from day

10

one" and that "none of [Mother's residential] placements that she had stayed in the last year has lasted longer than five to seven weeks." Transcript at 47-48, 50.

Regarding visitation, Smith described Mother's visits with E.Y. as being "sporadic throughout the case." Id. at 47. Smith went on to explain that Mother had failed to visit E.Y. from early May 2010 until after Halloween 2010. Although Mother later progressed to unsupervised visits in January and February of 2011, Smith reported that these visits "didn't last long" and were returned to supervised visits by March 2011. Id. at 50. We have previously stated that the failure to exercise the right to visit one's child demonstrates a "lack of commitment to complete the actions necessary to preserve [the] parent-child relationship." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007) (quotations omitted), trans. denied.

Finally, when asked if she would recommend that E.Y. be placed in Mother's care at this time, Smith replied, "No." Transcript at 50. Smith went on to explain that her recommendation against reunification was based on Mother's "lack of stability," "inconsistencies in stories," and "failure to communicate with [MCDCS]." Id. Quay likewise recommended termination of Mother's parental rights.

During the termination hearing, Quay confirmed that Mother was unsuccessfully discharged from home-based counseling services in May 2011 because she had made "no progress" on the goals she had developed regarding housing, education, money management, and mental health. Id. at 86. When asked to explain why she felt Mother had never shown the ability to financially care for E.Y., Quay testified:

> [E]ven though [Mother] claimed to work at a pizza place[,] I never saw a
> check stub . . . or any actual proof of income . . . . [Mother] moved three to

11

four times in the year the case was open because [she was] unable to maintain stable housing. One residence she had no running water, the last residence I worked with her on[,] the gas was on disconnect, the lot rent was behind, the phone was disconnected, um, [she] continued to just struggle from month to month of [sic] just trying to remain housed.

Id. at 87.

As previously explained, a juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang, 861 N.E.2d at 372. After reviewing the record in its entirety, we conclude that abundant evidence supports the juvenile court's specific findings set forth above. Mother's arguments to the contrary, emphasizing her self-serving testimony concerning recently moving into her mother's basement and obtaining part-time seasonal employment rather than the evidence of habitual instability and neglect cited by the juvenile court in its termination order, amount to an impermissible invitation to reweigh the evidence. See In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied.

## II. Abuse of Discretion

Next, we consider Mother's assertion that the juvenile court abused its discretion by admitting evidence of Mother's involvement in a prior CHINS case because that case

was "resolved seven years earlier, when [Mother] was a teenager" and did not involve E.Y. Appellant's Brief at 12.

The admission of evidence is entrusted to the sound discretion of the juvenile court. In re A.J., 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), trans. denied. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. Id. If a juvenile court abuses its discretion by admitting the challenged evidence, we will only reverse for that error if the error is inconsistent with substantial justice or if a substantial right of the party is affected. In re S.W., 920 N.E.2d 783, 788 (Ind. Ct. App. 2010).

When considering the termination of parental rights, a juvenile court "must evaluate a parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child." J.T., 742 N.E.2d at 512. Moreover, this court has previously explained that evidence of a parent's prior involvement with the Indiana Department of Child Services, including CHINS petitions filed on behalf of a child, is admissible as character evidence under Indiana Evidence Rule 405. See In re D.G., 702 N.E.2d 777, 779 (Ind. Ct. App. 1998). Here, the challenged evidence concerning Mother's involvement in a prior CHINS case constitutes relevant and admissible evidence as to Mother's habitual pattern of conduct in parenting her children and/or whether or not she has developed, or is likely to develop, the ability or interest in providing E.Y. with a safe and stable home environment in the future. The juvenile court therefore did not abuse its discretion when it allowed MCDCS to admit

13

evidence of Mother's prior CHINS case involving A.H. during the underlying termination hearing.

## Conclusion

This court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Public Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error occurred in this case. The judgment of the juvenile court terminating Mother's parental rights to E.Y. is hereby affirmed.

BAKER, J., and KIRSCH, J., concur.