**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 18 2013, 10:00 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**RONALD K. RYCHENER**
Indiana Department of Child Services
 Fayette County
Connersville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: B.M.B. and B.A.B., Minor Children, | ) ) ) |
| | ) |
| R.B., Father, | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | ) No. 21A01-1304-JT-188 |
| | ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE FAYETTE CIRCUIT COURT
The Honorable Eugene A. Stewart, Senior Judge
Cause Nos. 21C01-1109-JT-381, 21C01-1109-JT-382

**December 18, 2013**

**BROWN, Judge**

R.B. ("Father") appeals the involuntary termination of his parental rights to his children, B.M.B. and B.A.B. (collectively, the "Children"). Father raises two issues, which we revise and restate as:

I.      Whether the court abused its discretion in admitting evidence of Father's previous criminal convictions and pending criminal charges; and

II.     Whether the evidence is sufficient to support the trial court's judgment terminating his parental rights.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Father is the biological father of B.M.B., a girl born on January 5, 2007, and B.A.B., a boy born on September 11, 2008.[1] The evidence most favorable to the trial court's judgment reveals that on June 11, 2010, the Indiana Department of Child Services ("DCS") filed, and the court approved, verified petitions alleging the Children were children in need of services ("CHINS"). The CHINS petitions alleged as follows:

> On 5/29/10, the mother and father were asked to leave the Gray Haven Hotel for fighting and at that time they went to the home of the father's grandparents. On 6/7/10, the parents were asked to leave the home of the grandparents due to arguing among the family. The family was then homeless and the parents' families admitted to being "tired" of the parents' behavior. The mother left the children with the father and went to a friend's home. The mother, father and other family members have described domestic violence between the mother and father that have [sic]

---

[1] The juvenile court also terminated the parental rights of the Children's biological mother, D.H. ("Mother"). Mother, however, does not participate in this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's appeal.

occurred in front of the children. The mother states that the father is physically abusive to her and threatens to kill her. Both parents admit to abusing prescription drugs. Both parents report that they "snort" pills, such as Oxycotin [sic] and Loratab [sic]. The father has stated that due to the drug use, the family does not have money to rent another home and causes the arguments between the parents. The parents' drug use is directly affecting the parents['] ability to parent and care for the children. Due to the parents' homelessness, domestic violence and drug abuse, the children have been placed in licensed foster care.

DCS Exhibits 8, 9.

On July 9, 2010, Father and Mother appeared in person and by their respective counsel at an initial hearing and admitted to the CHINS allegations, and the Children were adjudicated as CHINS. On August 20, 2010, the court held a dispositional hearing at which the juvenile court awarded wardship of the Children to DCS. That same day the court, in its dispositional order and order of participation, directed Father to successfully complete a variety of tasks and services with the goal of reunification which included, among other things, to: (1) maintain contact with the DCS Family Case Manager ("FCM"); (2) notify the FCM of any arrest or criminal charges; (3) keep all DCS appointments; (4) maintain safe, suitable, and stable housing; (5) maintain a source of income; (6) not use, consume, manufacture, trade, distribute, or sell any illegal controlled substances; (7) complete a parenting assessment and all recommendations; (8) complete a substance abuse assessment and follow all treatments successfully; (9) submit to random drug screens, noting that not completing a drug screen in a timely manner would result in a positive result indication; (10) obtain a high school diploma or GED; (11) attend all scheduled visitations with the Children; and (12) participate in individual and family therapy.

3

On November 17, 2010, Father appeared with counsel at a periodic review hearing in which the court found that Father had been complying with the case plan and had progressed in his therapy goals, noting that he continued to work on his issues with co-dependency and domestic violence and that he was working on completing the full parenting curriculum as well as seeking full time employment and obtaining reliable transportation. The court also noted that he needed to continue in his efforts to live a sober lifestyle and that he was attending substance abuse treatment on a weekly basis, and that Father was "working on enhancing his ability to fulfill his parental obligations." DCS Exhibit 13. On April 19, 2011, following a subsequent periodic review hearing, the court entered an amended order, finding that Father had complied with the case plan, enhanced his ability to fulfill his parental obligations, visited the Children on a consistent basis, cooperated with DCS, and progressed with his therapy goals, noting specifically that the therapist recommended that Father "go from once a week to once every two weeks, due to his progress."[2] DCS Exhibit 15. The court authorized a trial home visit ("THV") for Father.

On May 27, 2011, the THV with Father and the Children began; however, it lasted three days only and ended on May 30, 2011 because Father failed to maintain contact with the FCM and allowed unauthorized contact between Mother and the Children. FCM Farrah Owens informed Father prior to the THV that Mother was not to be in the home when Children were present due to her non-compliance and their domestic conflict, and

_____

[2] We note that the court's findings regarding Mother were not similar to those of Father, in which the court found that Mother had not complied with the case plan, had not enhanced her ability to fulfill her parental obligations, and had not cooperated with DCS.

4

Father lied to FCM Owens about Mother's presence in the home. DCS removed the Children to ensure their safety. Soon after, DCS and service providers worked with Father to secure housing and childcare for a second THV, and the THV commenced on June 10, 2011. This second THV lasted until July 11, 2011, when FCM Owens visited Father's home and determined that the living environment had "diminished," specifically observing:

> [Father] was in the process of eviction if he did not pay the sum of over $300.00 within the matter of a few days. [He] did not know how he was going to get the money because he was not working. The home was very dirty with rusty tools in various rooms of the home, old food on the floor, open packages of old meat on the counters, dirty dishes in the sink, on the stove and on the kids table in the kitchen. There was no food in the freezer, but dead beavers. There was little food in the refrigerator and in the cabinets. [B.M.B.'s] room had clothes and other items all over the floor and the bed. There was no toilet paper in the house and the children were unkept [sic].

DCS Exhibit 18 at 4. Father also acknowledged that during the second THV, although Mother was not living in the home, she had visited the home.

Following the second failed THV, Father stopped cooperating with service providers. Specifically, on July 18, 2011, Father attended a child and family team meeting in which he indicated that he was leaving that day for Alaska where he had a job waiting for him. Also, his service providers at LifeLine noted that Father had shown a "decline in progress" including substance abuse relapse, continued codependent-thinking errors in his interactions with Mother, and unpredictable behavior and mood. DCS Exhibit 37. Father's visits were then returned to a supervised setting, although he had only one supervised visit, on August 3, 2011. Father stopped contacting LifeLine in August of 2011 and missed appointments, and services were eventually closed.

5

On September 27, 2011, DCS filed a petition seeking the involuntary termination of Father's parental rights to the Children. Also, on October 18, 2011, following a hearing in the CHINS matter, the court filed its order on periodic case review noting that Father had not visited the children and had not cooperated with DCS, and it specifically found that Father had been given every opportunity to be successful at reunification but had let outside influences hinder progress and had been arrested for false reporting. The court changed the permanency plan from reunification to adoption. In the ensuing months, Father was arrested on multiple occasions.

On September 26, 2012, and January 16, 2013, the court held a termination hearing in which DCS presented evidence consistent with the foregoing. At the hearing, FCM Owens testified that she had trouble contacting Father, but that after Father's arrests she was able to obtain phone numbers and addresses and tried to call him and send him correspondence. FCM Owens testified that termination of Father's parental rights was in the Children's best interests for their safety, and that Father continued to have positive drug screens, was unable to keep a stable living environment including a clean home and food, had failed two THVs, and continued to be involved in criminal activity.

FCM Nicole Whallon, who acted as FCM between May 2012 and June 2012, testified that Father visited the DCS office on May 25, 2012 and June 25, 2012, although he did not inquire about the Children or ask for a visit, and noted that she had trouble contacting him. FCM Whallon also testified that the Children were safe and happy in their foster home and appeared adjusted. Darrell Robinson, the Children's court appointed special advocate ("CASA"), testified that the children were very relaxed and

6

happy in the foster home. He recommended that the court terminate Father's parental rights based upon issues of domestic violence, substance abuse, and for repeatedly ignoring the guidelines of the juvenile court and DCS.

Regarding Father's substance abuse, FCM Owens testified that during the CHINS proceedings, Father had submitted to nine random drug screens and that three were positive and six were negative. She also indicated that even after completing substance abuse classes, Father tested positive during the second THV in June 2011 and refused a drug screen at the end of the THV, in which he "cussed" at FCM Owens when she asked him to take the screen. Transcript at 29. Father testified regarding his substance abuse that he "was doin' good," that he "didn't have any problem until after they came and got the kids," but that after DCS removed the Children following the second THV he "was drinkin' a little bit and stuff." Id. at 83.

During the hearing, DCS presented evidence of Father's criminal history, including that in April 2002, Father pled guilty to possession, consumption, or transportation of alcohol by a minor as a class C misdemeanor, and battery as a class A misdemeanor. That same month he also was charged with and pled guilty to a separate charge of possession, consumption or transportation of alcohol by a minor as a class C misdemeanor.[3] In October 2002, Father pled guilty to possession of marijuana as a class A misdemeanor and reckless possession of paraphernalia as a class A misdemeanor. That same day, under a separate cause number, Father pled guilty to another count of

---

[3] The chronological case summary for this cause reveals that Father had been placed on probation and charged with a probation violation stemming from charges filed in May of 2003; however, the State agreed to not revoke Father's probation in exchange for pleading guilty to that charge.

possession, consumption or transportation of alcohol by a minor as a class C misdemeanor. Father also was found guilty of violating probation in April of 2002 when he was arrested on the possession of marijuana and reckless possession of paraphernalia charges.

In January 2003 Father pled guilty to theft as a class D felony and was placed on probation. In June 2003 he pled guilty to public intoxication as a class B misdemeanor and was ordered to serve thirty days in the Fayette County Jail. On December 7, 2005, Father entered into a plea agreement regarding a charge of attempted conversion as a class A misdemeanor as well as a violation of probation on his theft conviction in which he agreed to serve sixty days and then have his probation terminated, as well as to a sentence of one year suspended to probation on the attempted conversion charge. In August of 2006, he pled guilty to violating his probation by failing to obtain a drug/alcohol evaluation and for refusing a drug/alcohol screen. Also, in October of 2007 he pled guilty to residential entry as a class D felony, and he was sentenced to one year suspended to probation.

In addition to these criminal convictions, DCS introduced, as DCS Exhibit 43(a), evidence of Father's guilty plea for false informing as a class B misdemeanor on August 11, 2011. DCS Exhibit 43(a) contains the probable cause affidavit which notes that on July 12, 2011, 911 dispatchers received a call from Mother that Father stole Mother's purse containing prescription medication, among other things, and fled from the area. Also, on July 15, 2011, a woman, Tabitha Colburn, informed an officer that someone had stolen all of her clothing which she had been keeping in a duffle bag at Father's home,

8

whom she had just met. The officer spoke with Father, who stated that "he thought a possible suspect in the theft was his 'baby's mama', Jayln Thompson . . . ." DCS Exhibit 43(a) at 2. Regarding the purse incident, Father told the officer that he did not know Mother and "that the incident involving the theft of a purse was a purse that belonged to Jayln Thompson." Id. Father stated that "Jayln is addicted to legal and illegal drugs," that "she has a prescription for different drugs including Lortab," that "Jayln had gone through all of her prescription Lortab" and "ran out of her pills," and that she and Father "devised a scheme in which he would take her purse from the home and put it in or near the alley behind her home so that she could report to RPD that [Father] had stolen her purse including her medication." Id. Father stated that "Jayln had since gotten her purse back." Id. The officer wrote that, following further investigation, he again spoke with Father, who at that point told him that "the mother of his children is [Mother]. He told me he made up the name Jayln Thompson in an attempt to keep [Mother] out of trouble just in case she was the one who had taken Tabitha's clothing." Id. at 3. Father was sentenced to 120 days suspended and ordered to perform thirty-two work crew hours by September 11, 2011, and, when he failed to do so, the court revoked two days of his previously-suspended sentence.

DCS also submitted evidence of various pending criminal charges. The court admitted as DCS Exhibit 31 a complaint filed in September 2011 in the Preble County, Ohio, Eaton Municipal Court for attempted theft. DCS also admitted as DCS Exhibit 32 an information filed in January 2012 for intimidation as a class A misdemeanor. Next, DCS admitted two separate informations for conversion as class A misdemeanors: DCS

9

Exhibit 33, filed in April 2012; and DCS Exhibit 34, filed in June 2012. DCS also admitted as DCS Exhibit 35 an information filed in June 2012 for receiving stolen property as a class D felony. Finally, the court admitted as DCS Exhibit 36 an information filed on August 20, 2012, for Count I, dealing in methamphetamine as a class A felony; and Count II, possession of chemical reagents or precursors with intent to manufacture a controlled substance as a class C felony. Father was housed in the Fayette County Jail at the time of the termination hearing stemming from the August 20, 2012 charges.

At the conclusion of the termination hearing, the court took the matter under advisement, and on April 15, 2013, issued its Findings of Fact, Conclusions of Law, and Order Terminating Parental Rights (the "Termination Order") in which it terminated the parent-child relationship between Father and the Children.[4] Father now appeals.

I.

The first issue is whether the court abused its discretion in admitting evidence of Father's previous criminal convictions and pending criminal charges. The admission of evidence is entrusted to the sound discretion of the juvenile court. In re A.J., 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), trans. denied. We will find an abuse of discretion only where the juvenile court's decision is against the logic and effect of the facts and circumstances before the court. Id. If a juvenile court abuses its discretion by admitting the challenged evidence, we will reverse for that error only if the error is inconsistent

---

[4] The Termination Order also terminated the parental rights of Mother to the Children.

10

with substantial justice or if a substantial right of the party is affected. In re S.W., 920 N.E.2d 783, 788 (Ind. Ct. App. 2010).

Father argues that although "a trial court must evaluate the parent's habitual patterns of conduct," the "rationale espoused" by the relevant case law "involves weighing one's parenting abilities against past patterns to predict future behaviors of neglect," but "[i]n this case, Father's criminal history has no relevance to the children's safety." Appellant's Brief at 24. Father notes that his previous convictions, "except for a recent B misdemeanor, all occurred before the children were born" and were "all for minor crimes which did not result in Father being sent away to prison." Id. at 25. He argues that his "criminal history has a long gap from the time his children were born until present" which underscores "the fact that Father became *more* responsible once B.M.B. and B.A.B. were born." Id. Regarding the evidence of pending charges, Father argues that he is maintaining his innocence of such charges and he "ought not be unfairly judged on these unproven accusations," noting that "[t]o hold that all documents from pending cases are relevant . . . would unjustly broaden the scope of TPR proceedings and would force parents to defend themselves against criminal accusations in a civil court." Id.

DCS asserts that Father acknowledges in his brief that the court was required to examine his criminal history and that, accordingly, his arguments in this regard are merely a request to reweigh the evidence. DCS notes that contrary to Father's suggestion, his criminal activities did not cease with the birth of his children, and points specifically to his residential entry conviction, in which the date of the occurrence of the crime was on or about July 19, 2007, about six months after B.M.B.'s birth, and the false

informing conviction which occurred in 2011. DCS also argues that the court did not abuse its discretion in admitting the evidence of the pending criminal charges, specifically noting that the pending criminal history was relevant "in that he had been incarcerated since August 16, 2012, [and] was unable to care for Children at the time of the termination hearing, and his release date was unknown." Appellee's Brief at 16. DCS maintains that the court correctly ruled that such evidence was admissible under Ind. Evidence Rule 403. DCS notes that the court's decision to terminate the parent-child relationship was not based solely on Father's pending criminal charges as it "also looked at other factors such as his criminal history, inability to provide a stable home, substance abuse issues, lack of visitation with Children, and what was in Children's best interests." Id. at 16-17. DCS argues that even if admitting evidence of the pending charges was an abuse of discretion, such error was harmless because the evidence is undisputed that he committed criminal acts after the birth of the children including the false informing conviction, which occurred during the underlying CHINS proceedings, and this evidence along with the court's other findings was sufficient to support termination.

A parent's character is at issue in proceedings to terminate parental rights. See Matter of D.G., 702 N.E.2d 777, 780 (Ind. Ct. App. 1998) (holding that specific instances of character, including evidence regarding a previous termination of parental rights, is admissible character evidence in a subsequent termination proceeding). Indeed, a parent's character is an integral factor in assessing a parent's fitness and in determining the child's best interest. Id. Also, this court has previously observed that in deciding whether to terminate a parent's parental rights, a court may properly consider evidence of

a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. In re N.Q., 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). This is because although a court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions, it must also, due to the permanent effect of termination, evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id.

Also, this court has recognized that the juvenile court may properly consider recent arrests of a parent, especially when such pending criminal charges might subject the parent "to possible executed time which would necessarily interrupt reunification services" or have an impact on the parent's ability to provide a safe and suitable home. See In re J.C., 994 N.E.2d 278, 283 (Ind. Ct. App. 2013), reh'g denied. Indeed, in J.C. this court held that "the trial court made findings regarding Mother's drug use and criminal activity that resulted in the children's removal," that "Mother was incarcerated at the time of the termination hearing" and "faced revocation of her probation for an earlier charge based on criminal activity," and that her "arguments are invitations for us to reweigh the evidence, which we cannot do." Id. at 290. We therefore conclude that the juvenile court did not abuse its discretion when it allowed DCS to admit evidence of Father's previous criminal convictions and pending criminal charges.

## II.

The next issue is whether the evidence is sufficient to support the trial court's judgment terminating Father's parental rights. When reviewing the termination of

parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied; see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[5] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied. "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Father challenges the sufficiency of the evidence supporting the trial court's findings as to subparagraphs (b)(2)(B) and (b)(2)(C) of the termination statute cited above.

A.    Conditions Remedied/Threat to Well-Being

Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the State to establish, by clear and convincing evidence, only one of the three requirements of subparagraph 4(b)(2)(B). Because we find it to be dispositive, we limit our review to

---

[5] We observe that Ind. Code § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether DCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of the Children outside Father's care will not be remedied. As noted above, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, but it must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. In re N.Q., 996 N.E.2d at 392. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." Id. In making this determination, the court may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment, and it can reasonably consider the services offered by the DCS to the parent and the parent's response to those services. Id. In addition, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. Id. The burden for the DCS is to establish only that there is a reasonable probability that the parent's behavior will not change. Id.

On appeal, Father argues that, the court found that he "failed to take part in the services referred by DCS, and ordered by the court, and failed to establish a safe and stable home," but that "[t]he court's findings do not find support in the evidence from the hearing and further, do not support the conclusion of law that the reasons for continued

16

placement of the [Children] outside Father's home will not be remedied." Appellant's Brief at 29. Specifically, Father argues that "[u]p until the final removal, [he] had at all times visited with the children" and "[b]y March 9, 2011, he had progressed sufficiently in therapy for the frequency of visits to be halved." Id. at 30. He notes that he also completed his drug addiction program with Cornerstone and attended AA/NA classes regularly. Regarding the drug screens, Father maintains that "of the three positives, one was a refused drug screen and one occurred right after the children were taken when Father admitted to having a problem." Id. He argues that "[b]y May 11, 2011, [he] had completed his GED requirements and was having unsupervised visits with his children," and that "[a]ll in all, caseworkers deemed him very 'cooperative' with reunification efforts." Id. at 31 (quoting DCS Exhibit 12 at 3-5). Father also argues that the court's conclusion that the conditions resulting in the Children's removal would not be remedied is not supported by the record, specifically noting that the Children "were removed from the home due to the parent's drug addictions, homelessness, and domestic violence" and "[t]hese issues had been resolved by the time of the final hearing." Id. at 31-32. He notes that he testified to owning a three bedroom trailer and having "completed drug treatment and was living drug free – and the DCS did not produce any evidence to show otherwise." Id. at 32. He suggests that "other than his refusal to take a drug test, caseworkers did not testify that he'd begun abusing drugs again." Id. He also asserts that there were no incidents of domestic violence after the children were removed from the home.

17

DCS begins its argument by noting that Father's arguments are a challenge to Finding 16, and it "acknowledges that Father *did* complete his GED and substance abuse classes including relapse prevention, and that until the second failed THV, he regularly visited Children." Appellee's Brief at 20. DCS argues that "Father does not contest the relevant findings listed in Finding 16 regarding his failed services," including not completing services with LifeLine, failing the two THVs, not visiting the Children after August 3, 2011, and failing to maintain contact with DCS after the second THV ended. Id. at 20-21. DCS also argues that Father's substance abuse issues remain unresolved, noting that he tested positive for cocaine in June 2011 after he had completed substance abuse treatment, and he refused a drug screen on July 11, 2011, which DCS and the court considered a positive result. DCS notes that Mother alleged that Father had battered her when she made her criminal complaint to the police resulting in Father's conviction for false informing. DCS maintains that Father "ignores the other half of the court's conclusion in that there was a reasonable probability that the *reasons for placement of Children outside Father's home* will not be remedied" and notes that "[a]fter the second failed THV, Father never progressed in services to the point where DCS could place Children back with Father." Id. at 24. DCS also suggests that Father's arguments are merely a request for this court to reweigh the evidence, noting specifically that the evidence demonstrated that he failed at the two THVs, he stopped participating in services, his LifeLine providers reported "that he had a 'remarkable decline in the past several months,'" he tested positive for cocaine in June 2011 after completing substance abuse treatment, he refused a drug screen at the time of the Children's removal from the

18

second THV, he last visited the Children in August 2011, he has been incarcerated since August 16, 2012, and he is facing six criminal charges including a class A felony drug-related charge. Id. at 21-22.

In its termination order, the trial court made detailed findings regarding Father's numerous failures to remedy the circumstances leading to the Children's placement outside of his home under Finding 16, and Father's arguments do not challenge the court's statements in that finding. First, the court found that Father failed to complete home based services with LifeLine. Second, the first THV failed after only three days, when "he failed to secure appropriate child care." Appellant's Appendix at 426. Third, Father failed in the second THV after about a month because "there was not an appropriate food supply in the home, the home was dirty with rotten food and rusty tools, the children were filthy, and [Father] refused to submit to a drug screen." Id. Fourth, Father failed three drug screens. The court also found that "[a]t the conclusion of the second failed [THV], [Father] failed to visit with the children with the exception of one time in August 2011," failed to maintain contact with DCS despite efforts by DCS to contact him, and that he was in custody on charges of dealing in methamphetamine as a class A felony and intent to manufacture a controlled substance as a class C felony. Id. Based on these and other findings, the court determined that the conditions that resulted in the Children's "removal or the reasons for the placement outside the home . . . will not be remedied in that both parents failed to take part in the services referred by DCS, and ordered by Court, and failed to establish a safe and stable home." Id. at 432.

19

A thorough review of the record reveals that clear and convincing evidence supports the trial court's findings as detailed above. As noted previously, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied. The findings provide ample evidence to support the trial court's ultimate decision to terminate Father's parental rights to the Children.

B.     Best Interests

We next consider Father's assertions that DCS failed to prove termination of his parental rights is in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

Father argues that "[t]he fact that the children are doing well in foster care is not a sufficient basis for termination." Appellant's Brief at 37 (citing In re A.B., 888 N.E.2d 231, 239 (Ind. Ct. App. 2008), trans. denied). He suggests that reversing the trial court's

termination order "would not mean that [the Children] would immediately be taken from [the] foster family and placed back with" him, but "[r]ather Father could work on gradually reuniting with [the Children] in a way that was not unduly traumatic to them." Id. at 38. DCS argues that, in A.B., the "court reasoned that the *sole* basis for terminating parental rights could not be because it was in the child's best interest to be adopted by her foster parents; *especially* where there was not sufficient evidence to support the trial court's determination that the parent would not likely remedy the conditions resulting in the child's removal." Appellee's Brief at 28. DCS maintains that in this case, "there *is* evidence to support *both* the juvenile court's legal conclusions that there was a reasonable probability that Father would not remedy the reasons for [the Children's] removal, and that continuation of the parent-child relationship was a threat to [the Children's] wellbeing." Id. DCS notes that both CASA Robinson and FCM Owens testified that termination was in the Children's best interest. DCS also argues that "Father's suggested plan of continued foster care . . . necessarily relegates Children to an indeterminate period waiting for a permanent home–with the hope that Father *may* rehabilitate," but the Children "need permanency and stability, and not wishful thinking and last minute plans." Id. at 29.

In addition to the findings previously cited, the court specifically found that based on the CASA's visit with the children and Father, it was in the Children's best interest to terminate Father's parental rights, noting that the Children are thriving in their present placement. The court also noted the FCM's testimony that termination of Father's parental rights was in the Children's best interest. These findings and conclusion are

supported by the evidence. In addition, we have concluded above that the conditions leading to removal will not be remedied, and to the extent Father relies on In re A.B., we find that DCS is correct that In re A.B. is distinguishable. Accordingly, we conclude that there is sufficient evidence to support the trial court's determination that termination of Father's parental rights is in the Children's best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

## CONCLUSION

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." In re A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

ROBB, C.J., and BARNES, J., concur.